**Thomas J. RYDER**

v.

**The UNITED STATES.**

**No. 273–77.**

United States Court of Claims.

Oct. 18, 1978.

Richardson R. Lynn, Nashville, Tenn., for plaintiff; Robert E. Hoehn, Nashville, Tenn., attorney of record.

Lynn J. Bush, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Thomas J. Ryder was employed by the Department of the Army as a Supervisory

General Engineer, GS–12, at Fort Campbell, Kentucky; he served there as chief of the Engineering Plans and Real Property Office of the Directorate of Facilities Engineering. At the instance of the then head of that Directorate, Col. Peach, Ryder was charged with inefficiency (in August 1973) and his removal sought on that ground. After a written reply from plaintiff, he was notified that the charge of inefficiency had been sustained and that he was to be removed on September 18, 1973.

Plaintiff chose to seek review under the Army grievance procedures and requested a hearing. This was held before an examiner of the United States Army Civilian Appellate Review Office ("USACARO") and Col. Peach was an important witness against plaintiff.[1] On the basis of the hearing, the examiner determined in a lengthy and detailed report that several specifications of inefficiency were not sustained and that the nine specifications which the examiner upheld did not warrant separation. Accordingly, the examiner recommended that plaintiff's removal from federal service be cancelled, that he be restored to his former or a like position, and that he be given a letter of reprimand for the nine sustained incidents.

Under Civil Service Commission procedures governing agency grievance systems—as implemented by the Department of the Army—the first official to act on the USACARO examiner's report was the post commander at Fort Campbell, General Berry. He was expressly empowered to accept the examiner's recommendations and to issue the decision on the grievance (favorable to Mr. Ryder) pursuant to those recommendations[2]—but he could not finally reject the recommendations (if, as here, they were favorable to the employee); if he found them unacceptable he had to transmit the entire grievance record to the designated higher level of authority, with his own recommendation of unacceptability. See Federal Personnel Manual, Chapter 771, Subchapter 3 ("Grievance System"), § 3–13a (1971), currently found in Chapter 771, Subchapter 1, § 1–21 (1976), and implementing Department of the Army Civilian Personnel Regulations. In a word, General Berry could definitively decide in favor of Ryder but he had no final authority (since the examiner had recommended against separation) to uphold removal.

When the examiner's report was received at Fort Campbell, the Civilian Personnel Officer sent it to the Director of Facilities Engineering (Col. Peach) for his concurrence or nonconcurrence, with the explicit recommendation that the local commander (Gen. Berry), accept the examiner's recommendations. However, Col. Peach was strongly of the view that Gen. Berry should not accept the report or recommendations, and submitted a lengthy signed statement to that effect. The Office of the Staff Judge Advocate at Fort Campbell recommended, on the other hand, that the examiner's recommendations be accepted by Gen. Berry.

Because of Col. Peach's opposition, the Civilian Personnel Office changed its position and recommended to Gen. Berry that he refuse to accept the examiner's report and forward the grievance to the next higher authority—the Commander, U.S. Army Forces Command ("FORSCOM") at Fort McPherson, Georgia—with the request that plaintiff's grievance be denied. Col. Peach's extensive written reasons for nonconcurrence were made available to Gen. Berry.[3] The record does not clearly show whether Col. Peach also spoke with the General or his deputy.[4] Very shortly, Gen.

---

1. Plaintiff did not have an attorney but represented himself. The hearing took almost 3 days.

2. He could also grant, if he wished, the relief sought by the employee without regard to the examiner's recommendations.

3. The contrary views of the Office of the Staff Judge Advocate were also sent to the general.

4. In forwarding the file to Gen. Berry (including the Peach memorandum), the general's deputy wrote: "Since this case is so involved, I recommend, when you are ready to do so, that Mr. Browder [the Civilian Personnel Officer] and I be called in to discuss it with you. You may

Berry forwarded the grievance to FORS-COM with the recommendation that that higher authority issue a decision to deny Mr. Ryder's appeal. The short forwarding letter said that Gen. Berry disagreed with the examiner's recommendations and believed that the evidence supported the charges of inefficiency and Ryder's separation was justified; a detailed but unsigned "statements of the basis for determining appeal examiner's recommendations are unacceptable" was appended to the letter. The defendant's briefs concede that "this statement of reasons was similar in both format and content to the paper which Colonel Peach had prepared earlier in response to the Civilian Personnel Office's request for views on the sufficiency of the USACARO report," and also that this statement sent to FORSCOM "was basically the same as Colonel Peach's memorandum and contained the identical charges and the same rationale against acceptance of the Examiner's recommendations."

Defendant does not affirmatively suggest, and there is no reason to believe, that plaintiff saw Col. Peach's written statement (either the response to the Personnel Office's request or the similar statement enclosed with Gen. Berry's letter to FORSCOM) before Gen. Berry made his determination, or that plaintiff had any opportunity to answer that statement prior to Gen. Berry's action.[5] However, the detailed statement appended to Gen. Berry's letter to FORSCOM was made available to plain-tiff (after the Berry letter was sent), and he did have the chance to reply to it and send his reply to FORSCOM before the latter acted.

FORSCOM upheld the removal in a brief letter and plaintiff sought review, as was his right, in the Civil Service Commission (first before the Federal Employee Appeals Authority and then before the Appeals Review Board).[6] Both levels of the Commission sustained the Army Department in separating him. Neither the Appeals Authority nor the Appeals Review Board mentioned the participation of Col. Peach in Gen. Berry's decision, and it is very unlikely that it was known at all to the Commission.[7] As we have noted, plaintiff does not appear to have learned about Col. Peach's role in the Berry decision until after suit was begun.

This action for reinstatement and back pay, on the ground that the removal was improper, was first instituted in the United States District Court for the Middle District of Tennessee (where plaintiff resides) and later transferred to this court under 28 U.S.C. § 1406(c) (1970). Both sides have moved for summary judgment on the basis of the formal administrative record and other government documents obtained by plaintiff through discovery in the District Court.

The major issue is whether Col. Peach's *ex parte* participation in Gen. Berry's consideration of plaintiff's case invalidated the

---

also wish to have Colonel Peach come in to give you *background;* however, since Colonel Peach is in an adversary position he should not be involved in discussions which will have a bearing upon your decision. To do so could well result in a complete refusal by FORSCOM to support our action" [emphasis in original]. In a deposition taken while this case was still in the District Court Col. Peach replied, "not to my knowledge, I don't ever recall ever discussing it with General Berry," to a question whether he ever conferred with the general with respect to this matter. He also said later in the deposition that he had not discussed his memorandum with Gen. Berry and intimated that he did not himself talk to the deputy.

5. We have to take it that plaintiff had no inkling of the intervention of Col. Peach in the

proceedings before Gen. Berry until after this suit was begun. Plaintiff's counsel flatly so represents and there is nothing of substance in the record before us to suggest otherwise (though defendant tries weakly at one point in its brief to raise some slight doubt).

6. Mr. Ryder, who continued to represent himself, did not desire a hearing before a representative of the Federal Employee Appeals Authority and none was held. At that time he did not know of Col. Peach's participation in the matter when it was before Gen. Berry.

7. The formal administrative record before the Commission does not contain Col. Peach's signed memorandum and would not alert the Commission to this problem.

removal process. The leading decision in this court on *ex parte* communications by adversaries in personnel-removal cases is *Camero v. United States,* 375 F.2d 777, 179 Ct.Cl. 520 (1967). That was also an Army grievance proceeding in which an adversary, evidentiary hearing was held after separation of an Army civilian employee. The grievance committee—comparable to the USACARO examiner in the present instance—also recommended that the removal action be revoked and the employee restored to his position. The deciding official was a Gen. Anderson who overturned the grievance committee and upheld the removal; he relied in substantial part on *ex parte* views solicited, among others, from the Army lawyer who had represented management at the grievance hearing. The court held that this taint of *ex parte* communications from an adversary vitiated the entire removal proceeding; Camero was awarded back pay for the wrongful removal.[8]

Except in one respect, *Camero* is precisely the same as plaintiff's case. Both involved trial-type evidentiary hearings before a grievance tribunal which recommended favorably to the employee. Both involved *ex parte* communications by a prime adversary of the removed employee. In *Camero* that adversary was the lawyer who had presented management's case to the grievance tribunal; here, the adversary was Ryder's superior, the Director of Facilities Engineering (Col. Peach), who was (and is acknowl-

edged to have been) the prime instigator of the charges and a chief witness against plaintiff at the grievance hearing.[9] In both cases, too, the plaintiff-employee did not know (at the time) of the *ex parte* communication and had no opportunity to respond to it before the deciding official (here, Gen. Berry; there, Gen. Anderson) made his determination.[10]

The one difference between the cases is that Gen. Berry (in this instance) was not the final decider in all circumstances—in view of the USACARO examiner's decision favorable to plaintiff, Gen. Berry could not himself decide *against* the employee but had to forward the matter to FORSCOM if he disagreed with the examiner. But Gen. Berry did have full and final authority to accept the examiner's report and to find for Mr. Ryder; he could on his own have ordered the removal set aside and plaintiff reinstated—and the whole proceeding would have ended there without any participation by FORSCOM.

■ It is this power of Gen. Berry to end the case in Ryder's favor, without referral to higher authority, which implicates the *Camero* principle of freedom from *ex parte* taints. An employee who has had a trial-type grievance hearing (or the equivalent), resulting in the recommendation that he be reinstated, is entitled to have the first official who can order his reinstatement

---

8. The *Camero* principle has continued to be accepted by this court. *See Bethlehem Steel Corp. v. United States,* 511 F.2d 529, 534, 206 Ct.Cl. 122, 131, *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975); *Jarett v. United States,* 451 F.2d 623, 629, 195 Ct.Cl. 320, 331 (1971); *J. L. Simmons Co. v. United States,* 412 F.2d 1360, 1385, 1387–88, 1389, 188 Ct.Cl. 684, 727–28, 731–33, 734 (1969); *Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 584–85, 188 Ct.Cl. 644, 671–72 (1969).

9. Defendant does not contend that Col. Peach was not an adversary in the same sense that the attorney was an adversary in *Camero.* The Fort Campbell command so viewed him. *See* note 4, *supra.* The notice to plaintiff of his proposed separation was signed by Robert Anderson, Col. Peach's deputy. (Mr. Anderson was also a witness against plaintiff.) The request to the Civilian Personnel Office at Fort

Campbell that removal proceedings be instituted against Mr. Ryder was signed by Mr. Anderson and strongly approved in writing by Col. Peach.

10. It is not certain that Gen. Anderson personally knew of the *ex parte* intervention of the management attorney in *Camero,* but it is quite clear on the record we have that Gen. Berry must have known, before he acted, that Col. Peach was involved and that he was a main adversary of Ryder's. The general's deputy so advised him (*see* note 4, *supra*); USACARO's Atlanta region called the attention of Fort Campbell to the danger of participation by Col. Peach in any decision by Gen. Berry; and the Civilian Personnel Officer pointed out to Gen. Berry this position of USACARO (though he did not agree with USACARO that Col. Peach's participation could be improper).

make that choice, if he wishes to accept the recommendation, without infected *ex parte* communications. That was true of Camero, and it is just as true for Ryder. In the same way that Gen. Anderson could have restored Camero, so could Gen. Berry restore plaintiff. With respect to the *ex parte* intervention, the cases are on exactly the same plane. An official who could authoritatively and finally restore the employee failed to do so after the exertion of improper *ex parte* influence.

It makes no difference that, at the next level when the case reached FORSCOM, Ryder had the opportunity to answer the views which had stemmed from Col. Peach (later transformed into Gen. Berry's own position). By then it was too late; plaintiff had irretrievably lost his valuable opportunity, explicitly given him by the regulations, to have Gen. Berry decide finally in his favor, untrammeled by improper *ex parte* approaches.[11] Under the regulations and established procedure, Mr. Ryder had a definite right, in these circumstances, to have Gen. Berry consider whether to restore him and only if that officer refused to do so would it be necessary for plaintiff to go further and seek vindication from FORSCOM.

What we said in *Camero* is squarely pertinent here: "Of course, one of the fundamental premises inherent in the concept of an adversary hearing, particularly if it is of the evidentiary type, is that neither adversary be permitted to engage in an *ex parte* communication concerning the merits of the case with those responsible for the decision. * * * It is difficult to imagine a more serious incursion on fairness than to permit the representative of one of the parties to privately communicate his recommendations to the decision makers. To allow such activity would be to render the hearing virtually meaningless." 375 F.2d at 780–81, 179 Ct.Cl. at 527.

■ Defendant then says that, even if all this be so, Mr. Ryder failed to present to the Civil Service Commission the point of *ex parte* adversary communications, and he is therefore barred from raising it in court.[12] The shortest answer is that plaintiff did not raise this issue because he did not know at that time of its existence and there was nothing to alert him in the formal administrative file which he was allowed to see. The indications of the *ex parte* contacts (before Gen. Berry made his determination to reject the examiner's recommendation) all come to light through discovery proceedings in the District Court prior to the transfer of the litigation to the Court of Claims. *See* note 5 *supra*. Of course plaintiff is not required to raise points (during the administrative process) with factual components of which he was unaware and had no reason to suspect or know.[13]

■ As its last defense, the Government urges that plaintiff cannot have judgment—despite the fundamental procedural defect in his firing—if it be shown (as defendant believes to be the case) that he would have been removed on the merits of the inefficiency charge against him in the absence of any such procedural defect. However, where a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the

11. In fact, the record contains substantial evidence that Gen. Berry might well have restored plaintiff if Col. Peach's views had not been interposed. The Civilian Personnel Office at Fort Campbell was at first favorable to accepting the grievance examiner's recommendation of restoration, as was the Office of the Staff Judge Advocate. It was not until Col. Peach's strong intervention that a contrary recommendation was put forward by the Civilian Personnel Office.

12. Citing such decisions as *Pine v. United States*, 371 F.2d 466, 178 Ct.Cl. 146 (1967);

*Indiviglio v. United States*, 299 F.2d 266, 156 Ct.Cl. 241, *cert. denied*, 371 U.S. 913, 83 S.Ct. 260, 9 L.Ed.2d 173 (1962).

13. Defendant asks us, in any event, to remand so that the Civil Service Commission can consider for itself the issue of *ex parte* communication. It is neither necessary nor appropriate to take that course because, in our view, that issue can be decided only the way we have determined it; any other solution would either be without support in substantial evidence or incorrect as a matter of law.

court has regularly taken the position that the defect divests the removal (or demotion) of legality, leaving the employee on the rolls of the employing agency and entitled to his pay until proper procedural steps are taken toward removing or disciplining him. In that situation, the merits of the adverse action are wholly disregarded. *See, e. g., Garrott v. United States,* 340 F.2d 615, 169 Ct.Cl. 186 (1965); [14] *Cunningham v. United States,* 423 F.2d 1379, 1385, 191 Ct.Cl. 471, 481 (1970); *Jones v. United States,* 203 Ct.Cl. 544, 550 (1974); *Gratehouse v. United States,* 512 F.2d 1104, 206 Ct.Cl. 288 (1975), *cert. denied,* 434 U.S. 955, 98 S.Ct. 480, 54 L.Ed.2d 313; [15] *Shaposka v. United States* (1977), 563 F.2d 1013, 1018, 215 Ct.Cl. ——, ——. The perfect illustration is *Camero* in which the court first held squarely against the employee on the merits of his separation, 345 F.2d 798, 170 Ct.Cl. 490 (1965), and later ruled that he could nevertheless recover back pay because of the same type of procedural defect we see in the present case. 375 F.2d 777, 179 Ct.Cl. 520 (1967).[16]

Defendant suggests that we must or should change our rule because of the recent decision of the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Doyle, an Ohio public school teacher, was refused continued employment by his local school board, in part because of communications he made which the Supreme Court held protected by the First and Fourteenth Amendments.[17] He brought suit in federal district court and obtained compensatory damages as well as

an order of reinstatement. Although it upheld the determination that Doyle's rights of free speech had been violated, the Supreme Court remanded for a determination whether the school board "had shown by a preponderance of the evidence that it would have reached the same decision as to [Doyle's] reemployment even in the absence of the protected conduct," 429 U.S. at 287, 97 S.Ct. at 576.

*Mt. Healthy* involved a state entity, a state employee, and an action against the state body under 28 U.S.C. § 1331 (1970) ("federal question" jurisdiction of the district courts). There is no indication in the opinion that the Court intended to alter our longstanding rule for federal employees suing the United States under the Tucker Act, 28 U.S.C. § 1491 (1970 & Supp. V 1975), for a procedural violation. The Supreme Court had itself applied that rule, automatically, in *Greene v. United States,* 376 U.S. 149, 164, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964). The relationship between the Supreme Court and the management of state governments and subdivisions is different from and more delicate (particularly where the Constitution is involved) than that between this court and the Federal Government. *Cf. Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

There are other significant differences between *Mt. Healthy* and the present case. The former concerned a substantive constitutional protection (the right of free speech), not a procedural violation going to the heart of the whole administrative proc-

---

**14.** "We apply the established rule for personnel and pay cases—that unlawful administrative action depriving a claimant of a procedural right voids the action and leaves the plaintiff entitled to his money otherwise due, until (at the least) proper procedural steps are completed * * *." 340 F.2d at 622, 169 Ct.Cl. at 198.

**15.** Pointing out that exceptions are made for harmless error, the *Gratehouse* opinion declared: "A prejudicial procedural error is not rendered harmless, however, because the merits of the dispute appear to be clearly against the employee." 512 F.2d at 1108 n. 3, 206 Ct.Cl. at 296 n. 3.

**16.** Under our long-standing, consistently applied rule, it is irrelevant that FORSCOM and both levels of the Civil Service Commission later sustained the merits of plaintiff's firing. (As already pointed out, there is insufficient evidence that any of these later deciding bodies knew of Col. Peach's improper communication to Gen. Berry). *See, e. g.,* note 14, *supra,* and the two *Camero* decisions.

**17.** There were also other accusations against Doyle of misconduct and improper attitude.

ess.[18] The latter type of procedural deprivation means that the entire adverse action was illegal, not merely (as in *Mt. Healthy*) that one of several substantive grounds for removal was improper.[19] We have also (in the absence of relevant procedural error) upheld removals where adequate substantive grounds appeared in the record together with some invalid reasons. *See, e. g., Pascal v. United States*, 211 Ct.Cl. 183, 185, 191, 543 F.2d 1284, 1285–86, 1289 (1976). That practice has been followed at the same time we have had a different rule for significant procedural lapses.

In addition, *Mt. Healthy* dealt only with constitutional issues, but procedural violations of the rights of federal employees frequently implicate no more than a statute or regulation. It would indeed be a peculiar reversal of values for us to extend the *Mt. Healthy* principle to violations of constitutionally protected procedural rights of federal personnel but not to those given by legislation or regulation [20]—and yet the *Mt. Healthy* opinion speaks only of the vindication of constitutional principles (*see* 429 U.S. at 284, 285, 285–86, 286–87, 97 S.Ct. 568).

■ We conclude, in sum, that the *Mt. Healthy* decision does not affect our established rule that a federal employee suffering a vitiating procedural deprivation can for that reason recover back pay and seek reinstatement because his removal was void. That does not mean, and it never has, that he would be immune from a new removal proceeding (on the same grounds) which was properly conducted.

For these reasons, plaintiff's motion for summary judgment is granted and the defendant's is denied. Plaintiff is entitled to recover back pay, the amount to be determined under Rule 131(c). Plaintiff is also entitled to reinstatement in his former or a comparable position.

---

**18.** No procedural deprivation was before the Supreme Court in *Mt. Healthy*.

**19.** The Supreme Court stressed that there were permissible grounds for refusing to continue Doyle's employment, and that it would not be unusual for proper grounds to exist along with an improper one.

BENNETT, Judge, dissenting:

Today the court takes an already exceedingly generous rule and stretches it to wholly unnecessary lengths. What it does today is to add further to the plethora of obstacles an inefficient or incompetent federal employee may use to delay or to invalidate his discharge from employment. Today's decision focuses and turns exclusively on a harmless technical procedural error while ignoring subsequent events which fully dissipated any taint of procedural irregularity. The court, further, overlooks plaintiff's failure to avail himself of administrative opportunities to air the issue on which he now prevails. Finally, the court departs from its own well-established precedents that it will not second-guess the administrators where the penalty assessed is authorized and applied without abuse of discretion.

The main precedent upon which the court relies established broad protection for federal employees against injury caused by private, *undisclosed* communications between agency decision makers and agency personnel whose active involvement as adverse parties to the employee in precedent levels of the administrative process, made their later *ex parte* role an affront to judicial notions of due process. *Camero v. United States*, 375 F.2d 777, 179 Ct.Cl. 520 (1967). One could hardly say that the balance we struck there between the interests of the relatively small group of federal employees who become the subject of adverse personnel actions, and of their employer, the Federal Government, was insufficiently solicitous of the former. By extending the *Camero* rule to this case, which is so different on the facts, the court makes bad social policy and bad law. The result may be to confirm the cynicism with which taxpayers increasingly regard the civil service "merit

---

**20.** In the present case plaintiff's procedural right can be thought to rest on the regulation establishing the grievance procedure, not on the Constitution itself. *See Camero, supra*, 375 F.2d at 780–81, 179 Ct.Cl. at 526–27, 527.

system," to render meaningless the myriad administrative remedies which are available, and to debase the meaning of due process protections.

Although the majority characterizes this case as controlled by *Camero*, I find the cases distinguishable in at least two material respects. The first concerns the disclosure of the contents of the allegedly prejudicial communication, while the second deals with plaintiff's unexcused failure to use administrative opportunity to pursue the issue on which he now relies so heavily.

With regard to the first distinction, it is important to note that before the final Army decision was made, plaintiff was furnished a copy of the reasons for which General Berry had decided not to affirm the grievance officer. Before the final Army decision was made, plaintiff had an opportunity to respond in detail to the content of Berry's comments and he did so. General Berry's comments were, of course, virtual reproductions of Colonel Peach's communication to Browder, the civilian personnel officer who passed them along to the general, unexpurgated. General Berry, in turn, adopted the Browder-Peach views as his own without much rewording. That plaintiff may not have known Berry's remarks reflected Peach's effort before Browder cannot be permitted to obscure the consideration that the *ex parte* aspect of the communication dropped entirely out before the Army Command made its final decision. This is so because there was no danger that the final Army decision would be based on facts or arguments which plaintiff had been denied an opportunity to rebut.

In the majority's view, however, the focus is not on the final decision made by the U.S. Army Forces Command (FORSCOM) but on the recommendation to it made by Berry, General Berry's views with regard to the grievance officer's recommendations may, arguably, have been tainted by the errant communication. But we have never ruled, nor would it make good sense to rule, that personnel actions must be invalidated, no matter how abundant the evidence and how complete the opportunities for adminis-

trative remedy of any procedural errors, merely because there exists the possibility that a recommendation somewhere below the final decision-making administrative level was possibly tainted by conduct failing to comport with our exacting standards of due process. Reason demands that there be some inquiry into the substantiality of the harm; the causal nexus between the error and the final decision must be examined. *Wathen v. United States*, 527 F.2d 1191, 1200 n.9, 208 Ct.Cl. 342, 367 n.9 (1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

Since there is no such nexus and no prejudice is established here, the court has developed a remarkable argument to justify the result it has reached. It has based its result on hypothetical facts. It says that although General Berry was not the final decision maker he would have been had he approved the examiner's report favorable to plaintiff. True, but we need not reach that point because he did not approve the report. That is the fact we have to deal with in this case. When we face the facts that exist, *Camero* falls out of the window. There is no authority in statute, regulation, or judicial precedent for the court's new holding that an employee "is entitled to have the first official who can order his reinstatement make that choice, if he wishes to accept the recommendation, without infected *ex parte* communications." If that is the law there is no point at all in having an appellate process to correct errors below. Utopia cannot be ushered in by such judicial fiat and that is why the administrative appellate procedure here was provided. The administrative process should be given the chance to correct its own mistakes, as it did here, without judicial interruption. That process has rendered full justice by due process here.

The *Camero* case has been cited in a few contract cases, as shown in note 8 of the court's opinion. I do not suppose anyone would argue but that it is improper for any final decision maker as, for instance, a board of contract appeals, to accept *ex parte* advice and information. Of course,

the ideal situation would be for no one to consider *ex parte* information. *Camero* is a suspect holding because it laid down a rule for military commanders which does not take into account the fact that they are not judges and ought not to be held to the judicial code of conduct in making their decisions. The duty of a commander would seem to dictate that before he fires someone on the recommendation of a grievance examiner that he ought to consider all the unbiased views he can get from his subordinates who have the capability of evaluating the matter at hand and who were not adversary parties to plaintiff. The product of a grievance hearing is not a judicial nor a final decision of any kind. It is a recommendation the commanding general can accept or reject. The instant case, which extends *Camero*, would bar the general, the final decision maker, from contact with subordinates whose only offense was that they had talked with their own subordinates who had a part in the affair. The general would thus be deprived of the advice of his lawyer, the staff judge advocate, and of his civilian personnel chief, the very people most likely to have the judgment a commander needs to help him arrive at a considered final decision on the grievance examiner's recommendations. I hasten to agree that it would be most improper for anyone, however, to provide new evidence to the *final* decision maker, evidence that the aggrieved party had no chance to rebut. That is the dictionary and common-sense meaning of *ex parte*. If that had happened in the instant case I would go along with the majority opinion. But, that is not the situation here. *Camero* is just not in point even if its prohibition of second-degree *ex parte* contact is sound. What is more helpful here is what the Supreme Court has taught in *Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955).

Gonzales was convicted under the Universal Military Training and Service Act for refusal to submit to induction in the Armed Forces. He had defended upon the ground that as a member of Jehovah's Witnesses he could not participate in war. He lost his case before his local draft board and went to the appeal board for a hearing. He lost there, too. The FBI investigation resulted in a Department of Justice report considered by the board and adverse to Gonzales, but no copy of it was given to him prior to the board's final decision. As in the instant case with the reports to General Berry and from him to FORSCOM, the report of the Department of Justice was only advisory to the appeal board. But, since plaintiff Gonzales did not see that information and since the board was the only decision-making body to pass finally on the entire file, the court said that Gonzales should have had a chance to reply to the Department of Justice recommendation so that the board would have *"all* of the relevant data." (Emphasis in text.) That is the very situation here except that our plaintiff *did* have his chance to comment on all of the relevant data before the final decision maker. Since he had that opportunity, and took advantage of it, the *Gonzales* holding makes it plain that he has no basis for his claim. He was not prejudiced by any so-called *ex parte* conversations below and has no right to recover since he has had full due process. As long as there is a right of appeal and a chance to answer the charges and the appellate decision is thus free from all taint, as here, plaintiff has had all the procedural protection he is entitled to. This is the concept of *ex parte* evidence treatment accorded everywhere. The Administrative Procedure Act, for instance, defines *ex parte* communications as those with respect to which prior notice to affected parties is *not* given. 5 U.S.C. § 551(14) (1976). *See also* 1 K. Davis, Administrative Law Treatise § 6:18 (2d ed. 1978).

I do not endorse the Government's argument that plaintiffs, to prevail on civilian back pay claims, must prove not only a procedural error but also show that the action would have led to a different result "but for" the error. Such a rule would place an impossible burden on plaintiffs, and we would not countenance it. The Government's argument is based on a misreading of several recent cases, including

*Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Day v. Mathews*, 174 U.S.App.D.C. 231, 530 F.2d 1083 (1976). Both of those cases, however, have something to offer here. Nothing in the Supreme Court's decision explicitly holds the procedure there outlined is applicable to federal employment cases where, as here, alleged procedural error arises to the dignity of a constitutional claim of deprivation of due process. However, since constitutional rights were involved in *Mt. Healthy*, we can safely conclude that the rights of federal employees are no less protected than those of Ohio school teachers whatever the origin of complaint. Other indications, however, that the court intends rights not to be manufactured on the basis of harmless errors are rife within the law for there is an unmistakable tendency to temper generosity with pragmatism and to continue the inquiry, once error is found, to determine its likely effect on the results complained of. As the court concluded in *Mt Healthy*, the proper test is one that protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights. That principle is not respected by the court in the instant case.

The defendant reads the two cases cited in the paragraph above as supporting the imposition of a burden solely on the employee to show the causal effect of the error, while there should be no doubt that the courts in those cases believed the principal burden must lie with the defendant once an error has been shown and an initial burden of going forward with evidence of prejudice has been met. The rules in those cases would permit a fair, just, and practical result here. Plaintiff has met his burden of showing the occurrence of a procedural error, and he has met his burden of showing that his error may not have been harmless, since the *ex parte* communication turned Browder, at least, completely around. As in *Mt. Healthy*, defendant would ordinarily now be given opportunity to show that the error was harmless and that plaintiff would have been discharged even absent the alleged procedural error. Of course, the record now before us supports such a finding, and on this motion plaintiff does not contest the charges of his inefficiency found to be supported by the examiner. It would be useless, therefore, to remand.

The second critical distinction between this case and *Camero* involves plaintiff's deliberate bypass of two administrative opportunities to correct the error of which he now complains after his case left the Army. Here, plaintiff was offered a hearing de novo before an administrative subdivision of the Civil Service Commission, the Federal Employee Appeals Authority (FEAA). He waived his rights to such a hearing, although he alleged to the FEAA that General Berry's recommendation "appear[s] to be perfunctory approval of a subordinate's decision." If plaintiff had availed himself of the opportunity for a hearing de novo before the FEAA, the full story of the *ex parte* communication would have become known and any remaining prejudice, if demonstrated, could at that time have been cured. Thus, even if FORSCOM's decision was at all tainted by Peach's letter to Browder, the FEAA's decision could not have been, particularly if plaintiff had used the hearing procedure. *Cf. Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). I do not mean to suggest that his failure to accept the offer of a hearing resulted in a less trustworthy decision by the FEAA, for that body's detailed findings were based on a careful study of a voluminous record including plaintiff's arsenal of arguments on both procedural and substantive issues. (Most of those arguments, it appears, plaintiff has now abandoned.) But, if there is any doubt about the quality of the FEAA's review, it is plaintiff who is responsible that the facts were not more thoroughly developed then.

Furthermore, when plaintiff thereafter appealed to the Civil Service Commission's Appeals Review Board (ARB), despite his suspicion expressed to the FEAA that Berry's decision rested on someone else's analysis, he did not include among his endless arguments this issue on which he now pins

all his hopes. The Appeals Review Board simply had no opportunity to rule on the issue of the *ex parte* communication because plaintiff never mentioned it to them. He says he did not know of it until he obtained discovery in this court, but his own allegations before the FEAA show his concern on this subject, a concern which he could have had aired but instead relinquished in favor of other arguments which have since completely failed him and are abandoned. It just cannot be said that plaintiff was ignorant of the error he now bemoans, for what ignorance remained resulted from his failure to act on the information he did have. Thus, his actions before the FEAA and the ARP waived the issue he now relies on, for our cases uniformly hold that contentions not raised at all levels of administrative review shall absent special circumstances, be foreclosed from judicial review. *Grover v. United States*, 200 Ct.Cl. 337, 345 (1973); *Haynes v. United States*, 418 F.2d 1380, 1382–83, 190 Ct.Cl. 9, 12–14 (1969); *Pine v. United States*, 371 F.2d 466, 467–68, 178 Ct.Cl. 146, 149 (1967). This well-established rule, grounded in compelling considerations of public policy, forbids us from acting on arguments which could as well have been made several years ago. Yet the court today not only acts on the basis of these long-waived arguments but, worse, grants back pay for the entire period that plaintiff failed to raise them.

A final point worthy of some mention involves a consideration ignored in *Camero*. This is the matter of judicial intrusion on agency determinations of penalties. In this case the charge against plaintiff was that he had failed to perform his official duties in a satisfactory manner; in short, he was found inefficient and his separation was for the good of the service. The agency cited 20 examples of deficiencies in plaintiff's work. The grievance examiner determined that nine of these deficiencies had been proved. There was thus, even under his view, abundant evidence that plaintiff was inefficient. In effect, then, the examiner sustained the charge against plaintiff but merely found some of the specifications wanting. The only important difference between those responsible for the initial agency action and the grievance examiner concerned the penalty to be applied for the established charge of inefficiency. Parenthetically, every deciding official or administrative body that considered the matter agreed that plaintiff was inefficient, and plaintiff on this motion does not even deny there is substantial evidence to show it. Today's decision thus does violence to the established rule that the court will not reverse an agency's assessment of a penalty for inefficiency unless an abuse of discretion is proved. *See, e. g., Grover v. United States, supra*, 200 Ct.Cl. at 353 and cases there cited.

The court trivializes notions of due process by constitutionalizing a simple personnel matter despite both the harmlessness of any error which may have occurred and plaintiff's considered relinquishment of opportunities for administrative correction. For these reasons, I am compelled, respectfully, to dissent from the court's opinion.