Gilbert H. SHAW, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent.

Appeal No. 56–81.

United States Court of Appeals,
Federal Circuit.

Jan. 13, 1983.

Charles E. DeWitt, Jr., Boston, Mass., argued for petitioner. With him on the brief were Flamm, Kaplan, Paven & Feinberg, Boston, Mass.

Richard F. Silber, Washington, D.C., argued for respondent. With him on the brief were Asst. Atty. Gen. J. Paul McGrath and Wyneva Johnson, Washington, D.C.

Before DAVIS, BENNETT and NIES, Circuit Judges.

OSCAR H. DAVIS, Circuit Judge.

This is an appeal from a decision of the Merit Systems Protection Board (MSPB) sustaining petitioner's removal from the

United States Postal Service for sabotaging government property. The charge was that on November 8, 1979 Shaw, a mail sorting clerk who was operating a letter sorting-machine and assigned on that day to Console 5 of the machine, wilfully and deliberately stuffed a postcard into the B-chain of that console, triggering a breakdown of the machine for six minutes (causing a delay of more than 350 pieces of mail).

After a hearing including oral testimony and a visit by the presiding official to the site, the MSPB credited testimony by Arthur Cameron, petitioner's supervisor, that on November 8th he was at the rear of the machine, verifying mail, when the buzzer sounded for Console 5, indicating that a jam had occurred there; Cameron shut off the power for that console, cleared the jam, turned the power back on, and looked through the machine tunnel to see if "everything was okay"; on so looking he saw petitioner Shaw's hand place a folded postcard under the B-chain, start the machine from the operator's controls, and the postcard caused the chain to go off the sprocket; Cameron could see that Shaw was sitting at the console and walked around to the other side of the machine, asking Shaw if he had tried to take anything out of the B-chain and Shaw responded: "No, I wouldn't touch the machine." Without then charging petitioner with an offense, Cameron called a mechanic to make the repairs which were made. Cameron also testified that mail can accidentally get in the B-chain, but in this instance he saw Shaw's hand insert the card. There was also other testimony, for management, from another postal employee that inserting a postcard could damage the machine as described by Cameron; that mail could not accidentally get into the B-chain unless there was a major jam at the C-chain; and that a person looking through the tube or tunnel, from the rear of the machine, could

see an area six inches high and three inches wide at the viewing area of the operator's console, and the operator's hands could be seen if they were in the viewing area.

Because there was conflicting testimony by petitioner's witnesses as to the possibility of viewing through the tube or tunnel, the presiding official (accompanied by representatives of both parties) visited the site, took a view,[1] and found that, on looking through the tube from the rear, he could see fingers placing a folded card beneath the B-chain. The presiding official could not see enough to identify the console operator but "could see that the person was wearing a brown short sleeved shirt and possibly could have seen more by moving my head up and down." The presiding official concluded that Cameron could determine that petitioner was the one who placed the postcard underneath the chain. On the basis of all the evidence, plus the presiding official's own visit, the latter found that Shaw had, as charged, stuffed a postcard beneath the chain. The MSPB denied Shaw's petition for review.

There is not, and could not be, any attack, on the existing record, on the substantiality of the evidence supporting the administrative determination. Though there is testimony going the other way, there plainly is substantial evidence sustaining the MSPB's decision. The assault, rather, is that the agency's delay in charging petitioner was a harmful procedural error warranting reversal of the MSPB decision. The alleged incident occurred on November 8, 1979; the letter proposing removal was served on Shaw on January 3, 1980.[2] At the MSPB hearing petitioner testified that he had no remembrance of any such incident, that problems with the chains occur frequently, and that the almost two-months' lapse of time prevented him from remembering the

1. Petitioner does not challenge the authority of the presiding official (together with the parties' representatives) to visit the site and take a view. It is not uncommon for triers of facts to take such a view when the occasion calls for it.

2. There was no Postal Service rule or regulation requiring that the charge be made in any specific amount of time after the incident took place.

incident and responding adequately to the charge.

■ The Civil Service Reform Act declares specifically that procedural errors can vitiate an agency decision only if they are "harmful," 5 U.S.C. § 7701(c)(2)(A) (Supp. II 1978), and it is settled that to be "harmful" the error must substantially impair the employee's rights. *Brewer v. United States Postal Service,* 647 F.2d 1093, 1097 (Ct.Cl. 1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982); S.Rep. No. 969, 95th Cong., 2d Sess. 64, *reprinted in* [1978] U.S.Code Cong. & Ad.News 2723, 2786. The regulation of the MSPB places the burden of showing such harm on the employee, and further defines harmful error as that "which, in the absence or cure of the error, might have caused the agency to reach a conclusion different from the one reached." 5 C.F.R. 1201.56(c)(3) (1982).

■ Even though we assume that the span of elapsed time was not due in any way to Shaw,[3] we agree with the MSPB that he has not shown that the delay was harmful error as to him. First, a part of the time must be recognized as acceptable. Cameron, the supervisor, gave on November 8th a written report with respect to the incident to his superior (indicating his view that Shaw's action was deliberate); Cameron filed another such report, at a superior's request, on November 19th. *Heffron v. United States,* 405 F.2d 1307, 1311, 186 Ct.Cl. 474 (1969), held that it is reasonable for an agency to make a complete investigation before bringing grave charges which could result in removal. This case fits that category; Cameron reported the matter to the inspection service,[4] and some time must be allowed for that to occur and the problem of possible discipline to be considered. At the least, the delay until November 19 or 20 was not an error at all.

Second, petitioner has not shown how he was harmed by the delay after November 19th or 20th even if that delay is considered erroneous. The heart of this case is that Shaw was charged with deliberately inserting a postcard into the B-chain so as to cause the chain to come off the sprocket and the machine to break down—*not* with negligently jamming the machine or negligently causing it to break down, or with improperly trying to unjam the machine. It is indisputable that petitioner does not contend that he tried to clear the machine and, in doing so, may have been seen by Cameron with his hand inside the machine.[5] At the MSPB hearing, Shaw squarely denied that he had ever knowingly and wilfully attempted to damage or destroy postal equipment, or had "ever stuck mail under the B-chain, either in the manner that was described here today or in any other manner," or had ever thought of inserting a folded postcard into the B-chain. Mr. Cameron testified that he had seen petitioner do precisely that which petitioner has denied. The issue in the case thus came down to the credibility of petitioner's version that he had nothing to do with the B-chain's coming off versus the credibility of Cameron's testi-

---

3. The Government says that the lapse of time *was due to petitioner's repeated absences from* his work and his failure to give to the post office proper information as to his address. The presiding official, in holding that harmful error had not been shown, did not refer to these circumstances, but the MSPB (in denying review of the presiding official's determination) referred to them. The record, however, is at best very thin on these points, and may not even *be adequate to support any consideration* of them at all. Accordingly, we assume that petitioner had no responsibility for the lapse of time.

4. Cameron testified: "Well, initially, when I *wrote up my description and reported it to the* general foreman[s], I thought at that time it was an inspector's case. That was my reasoning for not indicating to Mr. Shaw what I had seen."

5. At the hearing Cameron testified that, immediately after the B-chain came off as a result of the stuffing of the postcard, the witness *"walked around the machine, Mr. Shaw was* still sitting in Console 5. I asked him if he attempted to clear the machine, he said no, he wouldn't touch it. He said the B-chain was off." Cameron also testified that operators

mony that Shaw's deliberate act was the cause.[6]

That being the question, we do not see how the making of the charge against Shaw on November 20, 1979 (instead of January 3, 1980) would have better enabled him to prove or present his version that he had not taken the deliberate action with which he was charged. If he had not done that action, he obviously would have no more memory of the incident—which, in his view, never occurred as to him—on November 20th than he had on January 3d. He had, moreover, full opportunity to show his version of what occurred: he had witnesses who testified that someone in Cameron's position could not see enough through the tube to make an identification; there was also testimony that breakdowns of this type were not infrequent and can be caused by mail and that a breakdown was unlikely to have been caused by just a postcard; the mechanic who probably repaired the chain after the breakdown could not recall the incident at all and could not remember anything specific or unusual as to it.[7] As far as we can see, this is just the presentation that would be made by a person who took petitioner's position that he had nothing to do with this breakdown, and learned of the charge by November 20th. The delay in the making of the charge was likewise irrelevant to petitioner's ability to show that Cameron was wrong or not credible. The evidence we have just summarized goes to that point. Cameron was thoroughly examined by petitioner's representative and by the presiding official. The latter also noted in his opinion that no evidence was offered to indicate that Cameron was motivated by any animus toward Shaw. Finally, petitioner does not suggest to us—aside from the general but not-very-helpful statement that the delay was so long that he could not recall the incident at all—how he would have been better able to defend himself if the specific charge against him had been made on November 19th or 20th, rather than January 3d. Under the Reform Act and the MSPB regulation, it was Shaw's burden to show *harmful* error, and he has not done so.

We conclude that petitioner has not shown that any erroneous delay in making the charge harmed any of his substantial rights.

*Affirmed.*

NIES, Circuit Judge, dissenting.

I would set aside the action of the agency on the grounds that the record as a whole shows harmful error, within the meaning of the Civil Service Reform Act of 1978 (the Act), in the procedures leading to petitioner's removal. By failing to notify petitioner until two months after the occurrence on which the particular charge against him was based, petitioner was deprived of any opportunity to prepare a substantive defense. The error here is so egregious that, in my view, it constitutes a denial of due process.

The Act provides that an agency's action "may not be sustained if the employee . . . shows harmful error in the application of the agency's procedures in arriving at such decision." 5 U.S.C. § 7701(c)(2)(A) (Supp. IV 1980). The regulation implementing the Act defines "harmful error" as:

> Error by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different from the one reached. The burden is upon the appellant to show that based upon the record as a whole the error was harmful, *i.e.* caused substantial harm or

---

were not supposed to try to clear the machine by putting hands inside the machine.

**6.** If petitioner had actually been trying to clear the machine (which he denied) and had accidentally (though perhaps negligently) caused the B-chain to come off, it is very hard for us to believe that he would not have remembered the incident even in January 1980—especially in view of Cameron's evidence recounted in note 5, *supra*. A fortiori, if he had deliberately done the act with which he was charged, it is hard to believe he could not remember it.

**7.** Cameron testified that he could not remember the name of the mechanic who fixed the chain, and that he did not discuss the incident with the mechanic.

prejudice to his/her rights. 5 CFR § 1201.56(c)(3) (1980).

The agency notice to petitioner here was no more than *pro forma*. Notwithstanding congressional intent that an agency's action not be overturned by technicalities, it is clear that the object of the notice provisions of the Act is to allow an employee to make an informed reply:

> Congress thus intended to reduce the degree of detail required in order for the agency to avoid reversal on procedural grounds. S.Rep. No. 969, 95th Cong., 2d Sess. 50, *reprinted in* [1978] U.S.Code Cong. & Ad.News 2723, 2772. The agency, however, is still required to state "the reasons for the proposed action in sufficient detail to allow the employee to make an informed reply."

*Brewer v. United States,* 647 F.2d 1093, 1097 (Ct.Cl.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982).

The charge as it appeared in the notice of proposed removal served January 3, 1980, is as follows:

> On Thursday, November 8, 1979, at approximately 5:15 p.m., Supervisor Arthur Cameron was checking the sweep side of MPLSM "D". While he was verifying unreadable mails on Module # 5, the dropper jam buzzer sounded for Console # 5. Mr. Cameron cleared the dropper jam and watched to ensure that everything was alright [sic]. While watching, Mr. Cameron observed you through the dropper jam aperture, as you stuffed a postcard into the B-Chain at Console # 5, before you restarted Console # 5. This caused the B-Chain to come off when you started the console.

> In view of the foregoing you are charged with sabotage of Console # 5 on November 8, 1979 in that you willfully and deliberately stuffed a postcard into the B-chain on Console # 5 on November 8, 1979 thereby causing damage to and a break down of Console # 5 for six (6) minutes resulting in the delay of mail on Console # 5 (60 pieces per minute) for a total of 360 pieces of mail.

Petitioner's testimony on his own behalf, which is set forth in part below, can be reduced to three statements: breakdown of the machines was a common occurrence; he could not recollect the incident allegedly supporting the charge of sabotage; and he never intentionally caused sorting machine breakdowns.[1]

Breakdowns of mail sorting machines are chronic occurrences. Four witnesses, in addition to petitioner, testified concerning the regularity and frequency of such incidents. Mr. Cameron, petitioner's supervisor and

---

1. Q. As a LSM operator, have you ever experienced any problems with the B chains or C chains?

   A. Yes, it's more or less a common occurrence, *it happens several times a day.* [Emphasis added.]

   Q. Do you have any recollection of the incident for which you're being charged here today?

   A. No, 'cause I didn't receive a letter of the charges until January, a full two months after this alleged incident was supposed to have taken place, so, you know, up until then I was working eight hour shifts, and you know, overtime for Christmas, and to try to look back over two months and try to identify any specific incidents that may have happened, no.

   Q. Did anyone ever approach you prior to your receiving the notification of discipline, did anyone ever approach you during November or December or the early part of January concerning an incident that occurred on November 8th, anyone at all?

   A. No, nobody.

   Q. Do you recall—you were never contacted by the inspection service either, then?

   A. No, nobody contacted me at all.

   Q. Have you ever knowingly and willingly attempted to damage or destroy postal equipment?

   A. No. No, that's a serious charge. I would never do anything like that to postal equipment.

   Q. Have you ever, to the best of your recollection, ever stuck mail under the B chain, either in the manner that was described here today or in any other manner?

   A. No.

   Q. When you received the removal notice, what was your reaction?

   A. Well, I really didn't expect it. I guess you could say I was shocked. I went up to Mr. Cameron and told him I wanted to see a union steward, and that's when I talked to Mary.

accuser, testified that there were a number of breakdowns (not attributed to petitioner) on November 8, 1979, the date of the incident:

Q. Isn't it true you had four other chains come off the sprockets that night?

A. Well, if I have it down here, it's four. Yes, at least four, I'd say.

The mechanic, William Nadeau, who repaired the machine after the subject incident, confirmed that such breakdowns were "common" and occurred without tampering:

Q. In your experience as both an LSM operator and an MPE mechanic, are chain slippages, you know, coming off the sprockets or whatever, are they a fairly common breakdown?

A. Yeah.

Q. What causes it?

A. Usually letters getting under the chain, bent letters, something like that. Rubber bands, to that effect.

Q. Would you say that these breakdowns or the letters being caught under the chain normally are caused by the machine itself?

A. Yes.

Mary Kwiatkowski, a union representative, testified similarly:

Q. Are you an LSM operator now?

A. No.

Q. When did you leave the LSM program?

A. Just a week—just a week ago. But, former to that I was an LSM operator for four years.

            *    *    *    *    *    *

Q. Okay. Again, as an LSM operator and your experience in the LSM program, would you say that chains coming off the sprocket are a fairly common occurrence?

A. It's very common, especially sometimes you have trouble with one console, and I had mentioned to Mr. Cameron too that within the week this happened I was keying one night and my chain came off three times in the course of one night. And I brought that up to him that, you know, it is very frequent.

The substance of petitioner's defense is that he simply could not remember anything about a particular breakdown which had occurred two months before. This lack of recall was not limited to petitioner. The only two persons other than petitioner who did have first-hand knowledge of the incident, his supervisor and the repairman, had no independent recollection of significant facts.

Mr. Nadeau was shown by office records to be the mechanic who repaired the machine after the alleged sabotage. His testimony evidencing his lack of recollection of the incident follows:

Q. Mr. Nadeau, were you the mechanic that was on duty on November 8th, 1979?

A. I was told that I was. I guess the record shows that I was, but I don't really recall of it.

Q. By the record—what do you mean by the record?

A. Well, they asked who the mechanics were on the machine, and I was assigned to it that day. So I guess they went through my form and looked up the sheets there.

Q. Were you questioned by Mr. Cameron? Do you recall any questions on November 8th concerning the incident that had taken place where he had questioned?

A. I don't recall anything.

Q. Was there ever any mention of sabotage or stuffing a postcard on the B chain or anything like that?

A. Not to my knowledge.

On cross-examination, Supervisor Cameron testified that he could not remember the identity of the mechanic who corrected the subject breakdown even though he testified that he fetched the mechanic and spoke to him directly concerning the repair. Mr. Cameron's lack of recall, like petitioner's, can be explained by the passage of time, during which many breakdowns occurred.

Significantly, the nexus between Mr. Nadeau and the subject breakdown could only be established by written documents substantially contemporaneous with the breakdown and not by the memory of any witness.

The devastating effect of the agency delay which resulted in notice to petitioner on January 3, 1980, of the charge of sabotage is reflected by the record as a whole of which the above-quoted testimonial excerpts are merely representative.

The agency delay which prevented petitioner from presenting an informed reply is comprehended by the definition of "harmful error": error "which might have caused the agency to reach a conclusion different from the one reached." 5 CFR § 1201.56(c)(3) (1980). The majority's speculation that petitioner would have put in no better defense had he been notified on November 20, 1979, is irrelevant in view of the nature of the charge and the error here:

> [W]here a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the court has regularly taken the position that the defect divests the removal (or demotion) of legality . . . . In that situation, the *merits* of the adverse action are *wholly disregarded.* [Emphasis added.]

*Ryder v. United States,* 585 F.2d 482, 487–88, 218 Ct.Cl. 289 (1978).

As detailed in the majority opinion, petitioner was charged with sabotage based on a single incident, not with negligence. The charge of "sabotage" cannot be deemed of no more consequence than any other basis for removal as far as his future employment is concerned. It is an official branding. *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The nature of the charge in this case requires particular scrutiny of agency procedure to insure that due process was, in fact, afforded petitioner.

I conclude that there was no justification for the supervisor's concealing his intent to proceed against petitioner. No reflective judgment was necessary. No additional evidence could be garnered. Under the circumstances here, any delay in actual notice would have been prejudicial to the employee. In the absence of something which would highlight a particular breakdown, the incident becomes merely one out of hundreds of similar incidents occurring in the normal course of events and wholly fungible with all others. A delay of 56 days assured the result that the supervisor's testimony would constitute "substantial evidence" in support of the agency decision since no countering evidence could be put forth.