1999 ND 126

June Clara GREENWOOD,
n/k/a Duray, Plaintiff
and Appellee,

v.

Jamie Scott GREENWOOD, Defendant
and Appellant.

No. 980313.

Supreme Court of North Dakota.

July 13, 1999.

Jay H. Fiedler, Pearson, Christensen, Clapp, Fiedler, Fischer & Jensen, Grand Forks, for plaintiff and appellee.

Shirley A. Dvorak, Moosbrugger, Dvorak & Carter, Grand Forks, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Jamie Scott Greenwood appealed from an amended divorce judgment. We affirm.

[¶ 2] June Duray and Jamie Greenwood married in 1983, and had one child, Jarrid, in 1984. The parties divorced in 1987. The divorce judgment issued on November 17, 1987, which was based on the parties' agreement, granted June, the plaintiff, a divorce and custody of Jarrid, divided the marital property, ordered Jamie to pay child support of $450 per month, and ordered Jamie to pay spousal support. The judgment provided, in part:

> 4. Defendant shall pay to the Plaintiff the sum of Five Hundred and no/100 Dollars ($500.00) per month for spousal maintenance ... until the Plaintiff dies or has remarried, whichever occurs first, when said obligation for payment of said spousal maintenance shall cease. Further, the Plaintiff does hereby waive her rights as to any increase of spousal maintenance during the ten (10) years following the entry of the Decree or Judgment of Divorce. . . .

> 5. The parties may and shall live apart for the rest of their lives and each shall be free from any interference, direct or indirect, by the other as if each were unmarried. . . . Each may, for his or her separate benefit, engage in any employment, business or profession which he or she may choose.

The judgment also obligated Jamie to purchase a health insurance policy for June until she remarried, equivalent to the coverage she had through Jamie's employer.

[¶ 3] Jamie remarried in 1988. Jamie and his wife, Beth, have three children, who were born in 1988, 1991, and 1993. In 1989, Jamie moved to terminate his spousal support obligation and to reduce his child support obligation. At the motion hearing, Jamie withdrew his request to reduce his child support obligation. On November 7, 1989, the district court entered an order denying Jamie's motion to terminate spousal support.

[¶ 4] In 1998, Jamie moved to discontinue his spousal support and health insurance obligations to June and to change life insurance beneficiaries. June moved to have Jamie's child support obligation amended to conform to the child support guidelines.

[¶ 5] In an interlocutory order of May 14, 1998, the trial court ruled the divorce judgment "establishes spousal maintenance which is in the nature of permanent spousal support and not in the nature of rehabilitative spousal support." In its memorandum decision of August 17, 1998, the trial court found, among other things:

> Since the divorce, the plaintiff has not been fully employed due to her chronic illness. She was diagnosed with *systemic lupus erythematosus,* a connective tissue disease which involves inflammation of the collagen. . . . The plaintiff con-

tracted the disease shortly after the birth of the parties' child. . . .

While there is no known cure for the disease, there are varying levels of severity of the condition in different people, and the symptoms may appear and disappear over fairly rapid periods of time. . . . The primary symptoms of the plaintiff involve extreme tiredness and the impairment of memory and other cognitive abilities.

. . . .

Plaintiff also suffers from Raynaud's phenomenon, a common symptom of SLE, according to defendant's brief (attachment 25). The same attachment lists inability to concentrate as another complication, along with other mental or emotional components.

There can be no doubt that plaintiff suffers from SLE and that the disease may be quiescent, but she still has many of the symptoms, such as tiredness, inability to concentrate, memory loss and other cognitive problems.

. . . .

The evidence is clear that the plaintiff's health is still precarious and she is working to the full extent that her physical abilities allow. There has been no change in circumstances in that regard.

The defendant contends that plaintiff could work full time if she took the corticosteroids. There is no evidence of that in the record. . . .

Defendant also contends that there is a change in circumstances due to his decrease in income and his wife's physical problems. . . .

All of the alleged changed conditions advanced by the defendant are really not changed conditions at all. The fact that he has remarried and assumed family obligations was not unanticipated, nor was it involuntary. . . .

. . . . But plaintiff's health is problematic, and her outlook is far from rosy. She needs and deserves the spousal support provided under the judgment resulting

from the defendant's agreement and contractual undertaking to provide such support.

The defendant's income has increased significantly since the original divorce decree. He was then making about $51,000 per year. His income now is $62,020, including salary of $53,520 and commissions of $8,500. The plaintiff's income has remained fairly stable over the years.

[¶ 6] The court denied Jamie's request and increased his child support obligation to $556 per month. The judgment was amended accordingly. On appeal, Jamie contends the trial court erred in concluding the original spousal maintenance award was permanent, rather than rehabilitative; the trial court abused its discretion in excluding evidence and cross-examination about medical records before 1989; and the trial court's finding there was not a material change in circumstances warranting termination or modification of spousal support is clearly erroneous. We discuss his contentions in order.

I

[¶ 7] Jamie contends the trial court erred in construing the original judgment as requiring payment of permanent rather than rehabilitative spousal maintenance.

[¶ 8] "Interpretation of a judgment is a question of law, and an unambiguous judgment may not be modified, enlarged, restricted, or diminished." *Dakutak v. Dakutak*, 1997 ND 76, ¶ 6, 562 N.W.2d 750. "[T]he question whether a judgment is ambiguous is a question of law." *Id.* "There is an ambiguity when language can be reasonably construed as having at least two alternative meanings." *Id.* "If the same trial judge clarifies an original judgment, we afford the judge's clarification considerable deference." *Id.*

[¶ 9] Insofar as it is important to delineate the reasons for spousal support, permanent spousal support is awarded to provide traditional maintenance for a

spouse incapable of adequate rehabilitation or self-support. *Gregg v. Gregg,* 1998 ND 204, ¶ 20, 586 N.W.2d 312; *Cermak v. Cermak,* 1997 ND 187, ¶ 8, 569 N.W.2d 280. Rehabilitative spousal support is awarded to equalize the burdens of divorce or to restore an economically disadvantaged spouse to independent status, *Gregg,* at ¶ 20, by providing a disadvantaged spouse an opportunity to acquire an education, training, work skills, or experience to become self-supporting, *Heley v. Heley,* 506 N.W.2d 715, 719 (N.D.1993). "Although temporary spousal support to rehabilitate a disadvantaged spouse is preferred, it may be required indefinitely to maintain a spouse who cannot be adequately restored to independent economic status." *Heley,* at 720. Thus, a court should consider whether, in addition to rehabilitative support, permanent spousal support is also necessary. *Riehl v. Riehl,* 595 N.W.2d 10, 1999 ND 107, ¶ 18. A trial court awarding rehabilitative support may order permanent support if a subsequent change in circumstances warrants permanent support. *Cf. Schmitz v. Schmitz,* 1998 ND 203, 586 N.W.2d 490 (holding a trial court may extend rehabilitative support when maximum rehabilitation does not occur within the originally specified time).

[¶ 10] The spousal support provisions in the original divorce judgment incorporated terms the parties agreed to in a stipulated property, support, and child custody agreement. June did not work after the parties' child was born and she began to have health problems. The parties knew of June's health problems at the time of the divorce. The spousal support provisions in the original judgment awarding June spousal support until she dies or remarries used language appropriate for permanent support, but not for rehabilitative support. The long-term, permanent, nature of the award is also reflected in the language by which June waived her right to any increase for ten years after the divorce. The provisions also specified each party "may, for his or her separate benefit, engage in any employment, business or profession which he or she may choose," thus recognizing June might, or might not, work after the divorce. The language cannot reasonably be construed as having two different meanings. Insofar as it may be significant to June's right to receive spousal support, the judgment unambiguously provides permanent spousal support. Furthermore, the trial court judge in the original divorce proceeding is the same judge who ruled in this case the spousal support award in the original divorce judgment was permanent, not rehabilitative. We, therefore, afford the judge's determination considerable deference. *Dakutak,* 1997 ND 76, ¶ 6, 562 N.W.2d 750. We conclude the trial court did not err in concluding the spousal support award was permanent, rather than rehabilitative.

## II

[¶ 11] Jamie contends the trial court abused its discretion in excluding evidence and cross-examination about June's medical records before 1989. The trial court sustained June's objection when Jamie attempted to bring to the court's attention medical notes from April 1977 to September 1988. Jamie made the following offer of proof:

MS. DVORAK: It would have been shown on all of those occasions September '70 those notes in the seventies that the doctors all indicated that her lupus was asymptomatic. She was doing fine. The notes in the seventies indicate that she had complications of joint pain or complaints of joint pain and tenderness into the seventies.

[¶ 12] "The trial court has broad discretion in evidentiary matters, and its rulings will only be reversed if its discretion has been abused." *State v. Neufeld,* 1998 ND 103, ¶ 17, 578 N.W.2d 536. "[T]he scope of cross-examination is a matter within the trial court's discretion." *Id.* at ¶ 24. Relevant evidence is any evidence reasonably and actually tend-

ing to prove or disprove any fact of consequence to the determination of an action. *In re Lukens,* 1998 ND 224, ¶ 11, 587 N.W.2d 141. Relevant evidence is generally admissible, but may be excluded. *Ehrman v. Feist,* 1997 ND 180, ¶ 22, 568 N.W.2d 747. We will not reverse a trial court's decision to admit or exclude evidence on the ground of relevance unless the court abused its discretion. *Lukens,* at ¶ 11.

[¶ 13] The relevant inquiry about June's medical condition in this proceeding was whether or not there had been a material change of circumstances since the trial court last assessed June's health and need for spousal support in denying Jamie's motion to terminate spousal support in 1989. June's medical records before then were marginally relevant, at best. We conclude the trial court did not abuse its discretion in precluding evidence and cross-examination of June about pre–1989 medical records.

### III

[¶ 14] Jamie contends the trial court's finding there was not a material change in circumstances warranting termination or modification of spousal support is clearly erroneous.

[¶ 15] A trial court's determinations in awarding spousal support are treated as findings of fact and will not be reversed on appeal unless they are clearly erroneous. *Gregg v. Gregg,* 1998 ND 204, ¶ 20, 586 N.W.2d 312; *Kouba v. Kouba,* 544 N.W.2d 142, 143 (N.D.1996). "An award of spousal support must be made in light of the needs of the disadvantaged spouse and of the supporting spouse's needs and ability to pay." *Gregg,* at ¶ 20.

A trial court's findings of fact are presumptively correct. The complaining party bears the burden of demonstrating on appeal that a finding of fact is clearly erroneous. In reviewing findings of fact, we must view the evidence in the light most favorable to the findings. A

choice between two permissible views of the evidence is not clearly erroneous. Simply because we might view the evidence differently does not entitle us to reverse the trial court. A finding of fact is clearly erroneous only if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.

*Schmaltz v. Schmaltz,* 1998 ND 212, ¶ 6, 586 N.W.2d 852, quoting *Reimche v. Reimche,* 1997 ND 138, ¶ 12, 566 N.W.2d 790 (citations omitted).

[¶ 16] A spousal support award may be modified upon a showing of a material change in circumstances. *Wheeler v. Wheeler,* 548 N.W.2d 27, 30 (N.D. 1996); *Bryant v. Bryant,* 102 N.W.2d 800, 807 (N.D.1960). A material change in circumstances is something substantially affecting the financial abilities or needs of a party. *Cermak v. Cermak,* 1997 ND 187, ¶ 19, 569 N.W.2d 280. *Schaff v. Schaff,* 449 N.W.2d 570, 572 (N.D.1989). "The party claiming a material change in circumstances has occurred bears the burden of proof." *Cermak v. Cermak,* 1997 ND 187, ¶ 19, 569 N.W.2d 280. "[C]onsideration must be given to whether or not the change in circumstances was contemplated at the time of the original divorce decree or previous modifications." *Muehler v. Muehler,* 333 N.W.2d 432, 434 (N.D.1983). "Generally, a self-induced change in circumstances does not constitute valid grounds for a modification." *Id.*

[¶ 17] Courts should be more reluctant to modify provisions in a divorce decree based upon an agreement of the parties than in one based upon a trial court's findings about a party's ability to pay. *Wheeler,* 548 N.W.2d at 30; *Eberhart v. Eberhart,* 301 N.W.2d 137, 143 (N.D.1981); *Bryant,* 102 N.W.2d at 807; *Schaff,* 449 N.W.2d at 572. An original spousal support award based· upon an agreement by the parties "should be changed only with great reluctance by the trial court." *Huffman v. Huffman,* 477 N.W.2d 594, 597 (N.D.1991). "The district

court's determination as to whether there has been an unforeseen material change in circumstances justifying a reduction of support is a finding of fact that will not be set aside on appeal unless it is clearly erroneous." *Cermak*, 1997 ND 187, ¶ 17, 569 N.W.2d 280.

### A.

[¶ 18] The trial court found: "The evidence is clear that the plaintiff's health is still precarious and she is working to the full extent that her physical abilities allow. There has been no change in circumstances in that regard." Jamie contends those findings are clearly erroneous. Jamie does not dispute June's past lupus diagnosis, but insists it does not render her incapable of full-time work or incapable of being rehabilitated. He argues, (1) "[w]hile there was some evidence that, since the divorce, June has experienced a certain amount of fatigue and muscle ache ... the evidence, when viewed as a whole, indicates that the district court's finding that June's health is 'still precarious' was clearly erroneous;" (2) "June's medical records indicate that ... at least since 1989, June's lupus has been for the most part inactive;" (3) "Furthermore, June's medical records and her testimony document that any 'activity' of June's lupus, has been caused by June's own behavior ... failure to follow-through on the recommendations of her doctors, failure to continue on or take prescribed medications;" and (4) "it has only been when Jamie has sought a modification that June has claimed a 'flare-up' and/or returned to her rheumatology doctor." From our review of the record, we conclude there is ample evidentiary support for the challenged findings, and they are not clearly erroneous.

[¶ 19] June Duray has been diagnosed with systemic lupus erythematosus. The issue is its effect on her need for continued spousal support. June testified she has "a lot of joint pain and muscle aches;" "lupus goes into remission" and "kind of ebbs and flows over periods of time;" and her big-gest problem is she is always tired. She testified she is totally exhausted in the middle of the afternoon and has to take a nap, goes to bed at 9:00 each evening, and cannot work full-time because she is too tired. June testified that after Jamie filed his motion of April 7, 1998, she sought medical attention, as she thought her lupus was "flaring," because when she "got the papers" she didn't sleep well, "started bruising," started getting sores in her mouth again, was "losing hair," was "totally drained," and "stress causes these things to happen." June testified she "was worried about my insurance," and "thought I better get a complete physical, and get myself totally checked in case I lost that insurance." She testified Dr. Swenson recommended further neurological testing and she has an appointment to see a neurologist. June testified she went off her drugs in 1991, because "I wanted to handle it without any medication because I didn't want to have any more side effects." June testified that, although medication helped her fatigue and pain, it had side effects. She testified "when they put me on Plaquenil, I started getting or seeing kind of cloudy things;" and when she was on Prednisone, she could not "remember what [she] was doing half the time," she "was really confused," she gained thirty pounds, "lost some hair," had diarrhea, "started growing a moustache," and was so dizzy she could not work. June testified she got off Prednisone so she could work. She testified she deals with her conditions by "learning how to pace myself, to take out stressful things and to make my life as simple as possible." Compared to when she got divorced, June testified, her physical condition is "probably the same or worsened." June testified if she tried to work full time she would be too tired and "would be calling in sick half the time;" she has worked as much as she can, and she thinks if she went to work full time, her "whole job would be in jeopardy."

[¶ 20] Shannon Vodden said in an affidavit she has known June for 15 years and

sees her five or six times a week. Vodden said, "June can do nothing which is strenuous and can do little which involves physical strength" and "generally seems to be exhausted and requires rest by about 3:00 in the afternoon."

[¶ 21] David Braaten said in an affidavit he has known June for over 20 years, and June "tires very easily and requires a great deal of sleep. Even the simplest physical activities exhaust her.... She takes naps throughout the day." Braaten said he has "noted other symptoms including swollen wrists, feet and ankles," and does not believe June "would be able to physically tolerate full-time employment or employment that involved any level of physical strain."

[¶ 22] Daria Miller said in an affidavit she has known June since 1991, when she was June's supervisor at the YMCA Daycare Center, and sees June weekly. Miller said: "June fatigues very easily. She is unable to tolerate much physical strain or stress. She requires a great deal of sleep and daily health maintenance." Miller said she seen no improvement in June's strength or stamina since 1992.

[¶ 23] The evidence supports the trial court's findings that June's "health is still precarious," June "is working to the full extent that her physical abilities allow," and "[t]here has been no change in circumstances in that regard." We conclude those findings are not clearly erroneous.

B.

[¶ 24] Jamie contends the trial court's finding that "[t]he primary symptoms of the plaintiff involve extreme tiredness and the impairment of memory and other cognitive abilities," is clearly erroneous, "because there is no medical conclusion, in Dr. Swenson's report or otherwise, stating June's alleged memory problems are related to or stem from her lupus." The trial court quoted from and relied upon conclusions in Dr. Swenson's report:

"Her neuropsychological testing is abnormal and does not appear to be accounted for by depression. Her general cognitive scores seem suppressed for both verbal and nonverbal cognition with more variability in the Verbal subtest. She has striking verbal disinhibition on the Stroop Test and notable difficulties with problem solving. Her memory is Primarily affected by retrieval difficulties and perseveration. She also has word retrieval inefficiency and some mild stimulus bound Responding noted on visual subtests. Taken together, the test results are suggestive of frontal system dysfunction bilaterally.

"I have reviewed the literature and in fact came across a 1997 article done in Canada which looked at the pattern of neuropsychological dysfunction in inactive systemic lupus erythematosus. This was a very controlled study where they examined 58 subjects with an active SLE and 47 healthy controls. Cognitive impairment was identified in 43% of subjects with inactive SLE. The pattern of the neuropsychological dysfunction was not specific to any one brain region or any one neuropsychological process but rather was quite heterogeneous and suggested that SLE brain involvement is likely multifocal and diffuse. The other finding was that the length of time that the patient had the disease seemed to predict more cognitive dysfunction. They also found that these neuropsychological findings were not related to current depressive symptoms or current corticoid steroid use."

From our review of the evidence, we conclude the trial court's finding is a permissible inference from Dr. Swenson's report, and the finding is not clearly erroneous.

C.

[¶ 25] Jamie contends "it was not reasonable for June, as a spouse receiving spousal support and a health care benefit ... to voluntarily forego medical attention and advice for her condition, and then argue ... that her condition has not im-

proved or has worsened." Jamie argues: "June's desire to go without medication because lupus is incurable and she didn't want to experience any side effects was completely unreasonable." The trial court found:

It is true that plaintiff no longer takes the corticosteroid medication. She testified that it caused many side effects that made her uncomfortable. The literature, including attachment 25 to defendant's brief, advises cutting back on the drug as the symptoms recede. In plaintiff's case, she felt that the side effects were not worth the benefits. The disease is not curable, and the steroids only alleviate some of the problems, most notably joint pain. If there is no joint pain, the risks of the medication do not seem to justify the puffiness of the face, weight gain, depression, development of fluid retention and high blood pressure, risk of diabetes, infection, thinning of the bones (osteoporosis), cataracts, glaucoma, death of bony tissue, and the need for massive doses of steroids when surgery is necessary. The plaintiff is not unreasonable in her desire to live drug free.

[¶ 26] In light of the medical evidence and June's testimony about adverse reactions to medication, such as weight gain, hair loss, increased facial hair, memory difficulties, confusion, dizziness, and diarrhea, some of which had a negative impact on her ability to work, we conclude the trial court's finding that June "is not unreasonable in her desire to live drug free," is not clearly erroneous.

[¶ 27] Jamie has not shown a material change in June's circumstances warranting a reduction in or elimination of Jamie's spousal support obligation.

D.

[¶ 28] The trial court found: "The defendant's income has increased significantly since the original divorce decree. He was then making about $51,000 per year. His income now is $62,020, including salary of $53,520 and commissions of $8,500." Jamie disputes the finding his income has increased since the parties' divorce. He contends:

During the hearing on his motion for modification, Jamie testified that he was not claiming that his income is less now than it was in 1989. In fact, Jamie testified that, while his income since 1989 has fluctuated over the years, his income has not had any significant increases since 1989. In fact, Jamie stated that his income was "pretty much" the same as it was in 1989. In 1989, Jamie was earning approximately $60,000.

(Citations omitted.) Thus, Jamie insists his income is about the same as it was when the trial court denied his motion to terminate spousal support in 1989. Jamie does not quarrel with the court's finding his income now is $62,020 per year and does not contend his income is lower than it was in 1989 or when the parties divorced in 1987. If the finding Jamie earned about $51,000 per year at the time of the divorce decree is erroneous, Jamie has not demonstrated any prejudice.

[¶ 29] Jamie does dispute the trial court's findings about his financial circumstances:

The district court found that Jamie had not demonstrated a material change in his financial circumstances to warrant a reduction of his spousal support obligation. The district court's finding was clearly erroneous because (1) Jamie's remarriage and the fact that he now has three other children to support, though voluntary, must be given consideration in this case as being a material change in circumstances; (2) Jamie does not have the financial resources to pay spousal support of $500.00 per month because, while his income has basically stayed the same over the years, he has added expenses due to the following: June's health insurance has increased from approximately $100.00 at the time

of the divorce to $227.00, Beth's physical condition is not temporary, Jamie's child support obligation has been increased, Jamie incurs additional out-of-pocket medical expenses for Jarrid's emergency room visits.

[¶ 30] Most of Jamie's contentions about his financial ability to pay spousal support are based upon his expenses in supporting his present wife and their children. When asked what had changed since 1989 to warrant reducing or eliminating his spousal support obligation, Jamie testified:

A   Since 1989 it's been tough to make it because of financial difficulties and problems like I mentioned earlier. I had somewhere along the line hoped June would find someone so that the loss of the or the income on my part would go away. No, nothing has really changed much.

. . . .

A   Well, the only other change would be, of course, the fact that I have been remarried and I have three other children that I have to provide for also.

■■■■■ [¶ 31] Although Jamie has more financial responsibilities than he did when he and June were divorced, generally, a spousal support obligor's remarriage does not justify modification of spousal support provisions in a divorce judgment. *Lipp v. Lipp*, 355 N.W.2d 817, 819 (N.D. 1984).

The fact that the appellant has assumed an additional financial burden by his own remarriage cannot be used as an argument that the circumstances now justify the modification of the decree. The appellant knew of his obligation under the decree before assuming the additional burden of remarriage. Remarriage would not be such change of circumstances as to justify a modification of the terms of the decree.

*Bryant v. Bryant*, 102 N.W.2d 800, 807 (N.D.1960). Refusing to allow a spousal support obligor's remarriage to constitute a change of circumstances justifying a reduction or elimination of a spousal support obligation "is required in fairness to spouses and children who already exist, and one who is divorced cannot be permitted to choose a course which deprives them of what they are entitled to for the benefit of a future family he chooses to create." *Bingert v. Bingert*, 247 N.W.2d 464, 467 (N.D.1976). We adhere to those decisions.

■■■■ [¶ 32] Jamie's child support obligation was set at $450 per month in 1987, and the trial court increased it to $556 per month to comport with his income and the current child support guidelines. The premium for June's health insurance has increased over the years since Jamie agreed to pay it, but the increase is one that the parties must have considered when they divorced and the trial court incorporated their agreement into the divorce judgment.

[¶ 33] Jamie testified he earned $66,000 in 1993; $70,000 in 1994; $65,000 in 1995; $69,000 in 1996; and his 1997 income was reduced to $60,000 because of the flood in Grand Forks. He also projected, by annualizing his 1998 income average through May 15th, his 1998 income will be $71,376. We are not persuaded Jamie has shown he is unable to pay his spousal support obligation.

[¶ 34] Jamie has failed to show a material change in circumstances warranting reduction or elimination of his spousal support obligation.

[¶ 35] The amended judgment is affirmed.

[¶ 36] KAPSNER, MARING, NEUMANN, and SANDSTROM, JJ., concur.