1999 ND 178

**CAP PARTNERS, a North Dakota General Partnership, Plaintiff and Appellant,**

v.

**M. Todd CAMERON, Colleen Cameron, Brian W. Day, Mary Day n/k/a/ Mary Hoff, Thomas Tastad d/b/a Bismarck Party & Paper, Inc. d/b/a Paper Warehouse, Defendants and Appellees.**

No. 990008.

Supreme Court of North Dakota.

Sept. 1, 1999.

Clark J. Bormann, Bormann Law Office, Bismarck, N.D., for plaintiff and appellant. Appearance by Paul Myerchin.

Sean O. Smith, Tschider & Smith, Bismarck, N.D., for defendants and appellees.

VANDE WALLE, Chief Justice.

[¶ 1] CAP Partners (CAP) appealed from a district court judgment dismissing its claims against M. Todd Cameron, Colleen Cameron, Brian W. Day, Mary Day, and Thomas Tastad d/b/a Bismarck Party & Paper, Inc., d/b/a Paper Warehouse ("Paper Warehouse"), and awarding damages to Paper Warehouse, and from an order denying their motion for a new trial. We affirm.

[¶ 2] CAP leased to Paper Warehouse part of a Bismarck strip mall in 1993. The lease term was from July 15, 1993, to September 14, 1998. The lease required no rent until December 15, 1993, and required rent of $3,000 per month from December 15, 1993, through December 14, 1996, and $3,084 per month from December 15, 1996, through September 14, 1998. The lease required Paper Warehouse to pay its proportionate share of all taxes, special assessments, utilities, and insurance. The lease required Paper Warehouse to pay a "proportionate share of the cost of operating and maintaining the Common Area," with the amount to be adjusted "yearly on the basis of the actual Common Area Costs during the preceding twelve (12) month accounting period, plus reasonable anticipated increases or decreases in such costs." The lease further required CAP to furnish Paper Warehouse within sixty days after each accounting period "a written statement covering the accounting period just expired, showing in reasonable detail a general breakdown of the total actual operating costs, the amount of Lessee's Common Area Cost for such accounting period." The lease provided Paper Warehouse "shall not be required to make any repairs or improvements of any kind upon or to the Demised Premises," unless made necessary "by any action, omission to act or negligence of [Paper Warehouse], or any sublessee, or its respective employees, agents, or contractors."

[¶ 3] From December 1993 through November 1996, Paper Warehouse was billed $3,000 per month for rent, with portions allocated to common area maintenance ("CAM") and taxes. On January 5, 1996, Goldmark Property Management, Inc., CAP's agent, wrote Paper Warehouse that an audit showed Paper Warehouse owed $11,976.52 for CAM, taxes, utilities and

insurance. The letter did not contain information about computation of the CAM or other costs.

[¶ 4] Paper Warehouse unsuccessfully requested itemization of the CAM and other costs and refused to pay the $11,976.52. CAP served Paper Warehouse with a notice of intention to evict for nonpayment of rent, dated March 20, 1996, and with a complaint seeking an eviction order and damages. Paper Warehouse advised CAP, on June 20, 1996, it would "agree to voluntarily surrender the premises as requested in your Court action on or before September 1, 1996." Paper Warehouse paid $11,-900 in July 1996 to settle the claims for CAM and other expenses. On August 15, 1996, Paper Warehouse notified CAP it would be moving out of the premises by September 17, 1996. Paper Warehouse moved out on September 16, 1996. CAP amended its complaint on February 11, 1997, seeking damages for the rent and costs payable under the lease.

[¶ 5] After hearing the evidence, the trial court made a number of findings about the condition of the leased premises: "[f]rom the time Paper Warehouse moved into the strip mall there were problems with one of two heating/cooling units (HVACs) in the store"; the front HVAC unit "never operated at more than 30% of capacity. In the winter of 1995–96 this resulted in the front of the store ... to be cold"; two contacts with Goldmark received no response; the rear door "would neither close nor lock and was stuck for many months ... until, in the spring of 1995, Goldmark cut a portion off the bottom of the door. This allowed snow to blow into the store where it accumulated to a depth of 3" as far as five feet from the rear entrance"; "[a]lthough Mary Hoff complained to Goldmark about the snow blowing into the store, Goldmark never replaced or repaired the door"; "[w]hen snow melted on the roof, a steady stream of water flowed into the store and down a power pole near the cash registers"; in November 1995, Mary Hoff twice complained to Goldmark about the leaks but got no response; the roof was repaired in June 1995, but it still leaked; "[i]n 1996 Paper Warehouse employees used buckets ... to collect the dripping water.... Customers complained about the water and the hazard it created"; "[i]n May 1996 the store got very warm because the front HVAC would not cool the area"; in June, the temperature in the store exceeded 90 degrees on nine days, items melted, and "[c]ustomers complained and left the store with their shopping carts still holding merchandise"; "[i]n June 1996, Mary Hoff decided to move Paper Warehouse out of the strip mall"; and "[s]ix weeks after Paper Warehouse complained about the intolerable heat, in early July 1996, Goldmark replaced the HVAC." In response to arguments Goldmark had responded to Paper Warehouse's complaints and replaced the faulty HVAC, the trial court found: "It is undisputed that it took at least six weeks after complaints about the heat before a new HVAC rectified the problem. The uncontradicted testimony of Paper Warehouse employees was that the problems with the back door and the roof were never repaired." Finally, the trial court found "Goldmark breached the lease by failing to make repairs within a reasonable time after notification by Paper Warehouse."

[¶ 6] The trial court, applying both N.D.C.C. §§ 47–16–13 and 47–16–17 to the facts of this case, concluded "Goldmark and CAP Partners violated their duty to repair within a reasonable time as required by each statute."

[¶ 7] Regarding CAP's claim about CAM payments, the trial court found, in part:

Goldmark continued the misleading practice of billing only $3,000 per month and failing to provide an accounting of the actual CAM at the end of the year for both 1994 and 1995....

Goldmark should have been estopped from claiming the $11,976.52 in January 1996. Goldmark breached the lease by failing to provide the accounting which

was a prerequisite to collecting the CAM.

[¶ 8] The trial court found Paper Warehouse was constructively evicted:

The actions of Goldmark—the demand for payment of CAM without first providing itemization of those costs, the eviction action following Paper Warehouse's refusal to comply with the improper demand for CAM payment, the failure to timely rectify the HVAC, the failure to replace or repair the back door, and the failure to repair the leaky roof—if taken individually would not constitute constructive eviction. Together they seriously disturbed Paper Warehouse's enjoyment of the premises and made them unfit for occupancy for the purposes for which they were leased.

. . . .

Mary Hoff testified that Goldmark's failure to repair the HVAC during June when her employees were sick from the heat and she was losing customers on a regular basis was "the straw that broke the camel's back." She then decided to move out. Within three months Paper Warehouse was completely moved out of the strip mall. Paper Warehouse abandoned the property within a reasonable time after CAP Partners breached the lease. Paper Warehouse was constructively evicted by CAP Partners.

[¶ 9] The judgment dismissed CAP's claims and awarded Paper Warehouse damages, interest, costs, and disbursements. CAP moved for a new trial, which the trial court denied.

[¶ 10] CAP has raised the following issue on appeal: "Whether the facts justified vacating the premises under N.D. Cent. Code §§ 47–16–13 and 47–16–17 or under constructive eviction."

[¶ 11] We review a trial court's findings of fact under the "clearly erroneous" standard of N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is not supported by any evidence, if, although there is some evidence to support the find-

ing, a reviewing court is left with a definite and firm conviction a mistake has been made, or if the finding is induced by an erroneous conception of the law. *Burlington Northern and Sante Fe Railway Co. v. Burlington Resources Oil & Gas Co.*, 1999 ND 39, ¶ 10, 590 N.W.2d 433. "A trial court's conclusions of law are fully reviewable." *Id.*

I

[¶ 12] CAP argues N.D.C.C. §§ 47–16–13 and 47–16–17 do not authorize Paper Warehouse's vacation of the premises. Section 47–16–13, N.D.C.C., does authorize a lessee to vacate leased premises without further obligation "[i]f within a reasonable time after notice from the lessee of dilapidations which he ought to repair the lessor neglects to do so." Section 47–16–17, N.D.C.C., does authorize a lessee of real property to terminate the lease "[w]hen the lessor does not fulfill his obligations, if any, within a reasonable time after request, as to placing and securing the lessee in the quiet possession of the property leased, or putting it into a good condition, or repairing it." CAP contends the problems with the heating and cooling units, the roof leaks, and the back door "did not rise, as a matter of fact or law, to the level in this case for which the statutes would permit the premises to be vacated." CAP argues: "Since the problems never constituted 'dilapidations', nor was there convincing evidence that repairs were neglected after reasonable notice, the trial court erred when it concluded these facts granted the tenant a statutory right to terminate the lease."

[¶ 13] In *Peterson v. Front Page, Inc.*, 462 N.W.2d 157, 158 (N.D.1990), the trial court found a tenant was entitled to abandon a lease because the landlord failed to maintain the premises:

[T]he district court found that Peterson had breached his duty to maintain the parking lot, the heating and air conditioning systems, and the elevator, and had breached an option-to-purchase pro-

vision of the lease. Because Peterson had been given reasonable time to correct his breaches and did not correct them, the court concluded the tenant was entitled to abandon the lease.

This court determined the tenant was entitled to relief under N.D.C.C. § 47–16–13, and affirmed the trial court's ruling the tenant could abandon the lease. *Id.*, at 160.

■ [¶ 14] We find no reason to distinguish these dilapidations as a matter of law. The defects here are as much dilapidations as those in *Peterson* and gave rise to a right to vacate the leased premises under N.D.C.C. § 47–16–13. When not corrected within a reasonable time after request, those defects were grounds for Paper Warehouse to terminate the lease under N.D.C.C. § 47–16–17. "Whether a party has breached a lease is a finding of fact." *Peterson*, 462 N.W.2d at 158. The trial court found "Goldmark breached the lease by failing to make repairs within a reasonable time after notification by Paper Warehouse." In light of the trial court's findings on the condition of the premises and Paper Warehouse's notifications about repairs needed, we conclude the trial court's finding is not clearly erroneous and Paper Warehouse was entitled to terminate the lease and vacate the premises under N.D.C.C. §§ 47–16–13 and 47–16–17.

## II

■ [¶ 15] CAP argues: "Since the evidence did not show the tenant was denied the full use and enjoyment of the premises for a material period of time, the trial court erred when it held that Paper Warehouse was constructively evicted." Sections 47–16–13 and 47–16–17, N.D.C.C., provide tenants with additional remedies, but do not otherwise alter the common law. *See Francis v. Pic*, 226 N.W.2d 654, 658 (N.D.1975), *Newman v. Sears, Roebuck & Co.*, 77 N.D. 466, 476, 43 N.W.2d 411, 417 (1950). The trial court found CAP's actions constructively evicted Paper

Warehouse, and there may be facts in the record to support that finding. However, in light of our conclusion the trial court's finding CAP breached the lease was not clearly erroneous, and our conclusion Paper Warehouse was entitled to terminate the lease and vacate the premises under N.D.C.C. §§ 47–16–13 and 47–16–17, we need not determine if Paper Warehouse was constructively evicted from the leased premises.

## III

[¶ 16] CAP contends Paper Warehouse waived any right to terminate the lease and vacate the premises, arguing "[t]he problems with the premises" existed from the time Paper Warehouse took possession of the property, "[n]evertheless, as of March 1996, Paper Warehouse intended not only to stay on the premises but to even *expand* its space," and "[t]he failure of the trial court to find a waiver by Paper Warehouse was clearly erroneous."

[¶ 17] The trial court addressed CAP's waiver argument in denying CAP's motion for a new trial:

> Secondly, Plaintiff argues Defendants waived their right to assert constructive eviction. Stated differently, Plaintiff asserts defendants did not abandon the premises within a reasonable time. The evidence showed Plaintiff failed to repair the HVAC during June 1996. Defendant Mary Hoff noticed her employees were sick from the heat and she was losing customers on a regular basis and then decided to move out. Within three months Defendants vacated the premises. This is substantial evidence supporting the court's determination that Defendants abandoned the strip mall within a reasonable time.

■ [¶ 18] "A waiver occurs when a person voluntarily and intentionally relinquishes a known right or privilege." *Peterson v. Front Page, Inc.*, 462 N.W.2d 157, 159 (N.D.1990). "The existence or absence of waiver is a finding of fact." *Id.*

The trial court did not find Paper Warehouse waived its right to terminate the lease and vacate the premises. The trial court found "Paper Warehouse abandoned the property within a reasonable time after CAP Partners breached the lease."

■ [¶ 19] Paper Warehouse experienced a number of problems, and made a number of complaints, and CAP's failures continued over a substantial period of time. As in *Peterson*, there was delay between the genesis of the right to terminate the lease and the exercise of that right, but the fact the condition of disrepair continued throughout the period and that Paper Warehouse repeated its demands for repairs during that period supports the trial court's finding that Paper Warehouse did not waive its right to terminate the lease. *Peterson*, 462 N.W.2d at 159. In March of 1996, Mary Hoff testified, Paper Warehouse had "no intentions of leaving" and considered "possibly expanding." But that fact does not undercut the trial court's findings, especially in light of Hoff's testimony CAP's "notice of eviction had a lot to do with" her change in position, because "I didn't think at that point I had any choice." Also, existing deficiencies continued without repair, and a new problem, with the air conditioning, occurred, which was not fixed until after Paper Warehouse decided in June 1996 to vacate the premises. While the air conditioning was fixed in July 1996, the trial court found "the problems with the back door and the roof were never repaired." We conclude the trial court's finding "Paper Warehouse abandoned the property within a reasonable time after CAP Partners breached the lease" is not clearly erroneous, and we are not persuaded the trial court's failure "to find a waiver by Paper Warehouse was clearly erroneous."

■ [¶ 20] CAP argues "it was clearly erroneous for the court to hold that the decision to terminate the lease[ ] was made in June," because Paper Warehouse's counsel said at trial Paper Warehouse had told CAP in February or March of 1996 it

would be leaving in the fall of 1996. Merely because Paper Warehouse had several possible grounds for terminating the lease and advised CAP on several occasions it was terminating the lease does not make the trial court's finding clearly erroneous. A choice between permissible views of the evidence is not clearly erroneous. *Reimche v. Reimche*, 1997 ND 138, ¶ 12, 566 N.W.2d 790.

[¶ 21] CAP contends Paper Warehouse's complaints "were asserted simply as a pretext to avoid contractual obligations" and "Paper Warehouse simply did not want to make the CAM payments which CAP sought." Paper Warehouse did not avoid its contractual obligations, but settled CAP's claim for CAM payments before abandoning the leased premises. Furthermore, the conditions Paper Warehouse was experiencing might have continued to be tolerable at the level of expense it had been paying before CAP billed it for the additional CAM payment it sought, but were not tolerable at the higher expense level. Under the circumstances of this case Hoff's idiomatic observation about "the straw that broke the camel's back" rings true.

[¶ 22] The judgment and the order denying the motion for new trial are affirmed.

[¶ 23] SANDSTROM, NEUMANN, MARING, JJ., and RALPH J. ERICKSTAD, S.J., concur.

[¶ 24] RALPH J. ERICKSTAD, S.J, sitting in place of KAPSNER, J., disqualified.