2000 ND 60

**Fred LAWRENCE, Claimant and Appellee,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellant.**

**and**

**Jobbers Warehouse, Inc., Respondent and Appellee.**

**No. 990240.**

Supreme Court of North Dakota.

March 23, 2000.

Kathryn L. Dietz, Dietz, Little & Haas, Bismarck, N.D., for claimant and appellee.

H. Malcolm Pippin, Special Assistant Attorney General, Williston, N.D., for appellant.

Monte L. Rogneby, Kapsner & Oliver, Bismarck, N.D., for respondent and appellee. Submitted on brief.

MARING, Justice.

[¶ 1] The North Dakota Workers Compensation Bureau appealed from a district court judgment reversing a Bureau order denying Fred Lawrence further disability benefits. We hold the Bureau's ex parte consultation with outside litigation counsel about a pending Administrative Law Judge recommendation violated N.D.C.C. § 65–01–16(8) and N.D.C.C. ch. 28–32. We also hold an injured worker is justified in refusing a job offer under N.D.C.C. § 65–05–08(7) if a reasonably prudent person would refuse the offer under the same or similar circumstances. We reverse the judgment and remand with instructions to remand to the Bureau for rehearing.

I

[¶ 2] In August 1997, Lawrence began working as an over-the-road truck driver with a Bismarck based employer, Jobbers Moving and Storage Company. When Jobbers hired Lawrence, he had been living in California since 1995. Lawrence sustained a back injury on September 13, 1997, while unloading a piano in Illinois during the course of his employment. Lawrence returned to Bismarck on September 22, 1997, and after a discussion with representatives of Jobbers, it was jointly agreed Lawrence would return to California in October 1997 for treatment of his injury. The Bureau accepted Lawrence's claim for benefits.

[¶ 3] On November 26, 1997, Dr. Wilfred Eastman performed back surgery on Lawrence in California. On January 15, 1998, Dr. Eastman released Lawrence to work at a sedentary job for 4 hours per day. In January 1998, Dr. Floyd Naugle also released Lawrence to work at a sedentary job for 4 hours per day.

[¶ 4] Jobbers sent Lawrence a written modified job offer, dated January 22, 1998, with duties that included computerizing records and updating operating procedures at Jobbers' Bismarck office:

> We have work available 5 days per week, 8 hours per day, and the rate of pay will be $507.00 per week at Jobbers Moving & Storage in Bismarck, ND. Your medical provider has indicated that they believe that this position is physically appropriate for you at this time. Your work ability as defined by your physician has been reviewed and it is understood that you are to perform only duties within the guidelines and you will obtain assistance as needed for duties not within these recommendations.

> You understand that the duties outlined above can be modified to fit your work ability as defined by your physician. You will also be responsible to notify your immediate supervisor if you are experiencing any problems in the performance of any duties within your restrictions. You are responsible for notifying your immediate supervisor of any time off or modifications to your work schedule. Your return to work program will be considered a job duty and you will attend them as scheduled, or it will be deemed failure to show up for work.

[¶ 5] Lawrence refused Jobbers' written offer, noting "I do not accept this job offer at this time because my doctor's [sic] Naugle & Eastman only released me to work 4 hrs per day."

[¶ 6] Jobbers sent Lawrence a second written job offer:

Jobbers Moving and Storage Co. understands that your doctor has only released you for 4 hours of work per day currently, but is willing to pay you for an 8 hour work day, until it is deemed appropriate for you to work 8 hours per day by your doctor. We are doing this with the understanding that the remaining 4 hours each day will be used for doctors visits and physical therapy as scheduled by your primary care physician.

We want to work with you and your doctor as we proceed down the path of recovery from your injury. As I stated in the original job offer that I have attached again for your review, we have work available from 4–8 hours per day 5 days per week and are offering a rate of pay of $507.00 per week at Jobbers Moving & Storage Co. in Bismarck, ND.

Lawrence refused Jobbers' second offer "because I can't travel at this time."

[¶ 7] Jobbers then made Lawrence a third written offer:

You stated that you are refusing the job offer because you cannot travel, does this mean you are unable to travel on all means of transportation. I believe your doctor only stated that you cannot drive, but there are alternative means of travel (i.e. bus, train airplane, etc . . . ). If your concern is the cost of an airplane ticket, it will be provided for you, so that we can all proceed down the path of recovery from your injury.

Lawrence refused that offer stating "it is not feasible for me to accept a job offer in Bismarck, N.D. at this time."

[¶ 8] On March 10, 1998, the Bureau denied Lawrence further disability benefits, finding he had voluntarily limited his income by refusing to accept transitional employment without good cause under N.D.C.C. § 65–05–08(7). Lawrence requested a rehearing, and at a subsequent administrative hearing, the Bureau was represented by its outside litigation counsel. An administrative law judge thereafter issued a recommended decision finding "[i]t would be reasonable for an hourly or salaried employee to expect his employer to reimburse him for living expenses incurred while working on a temporary basis away from his home. That is the situation here; and [Lawrence's] refusal to accept the job without some provision for payment of his living expenses is justified." The ALJ recommended deciding Lawrence was justified in rejecting Jobbers' offers and had not voluntarily limited his income under N.D.C.C. § 65–05–08(7).

[¶ 9] The Bureau rejected the ALJ's recommendation and denied Lawrence further disability benefits. The Bureau found Jobbers' offers went well beyond what any reasonable employer would be required to provide an employee for a modified transitional job under North Dakota law. The Bureau concluded the greater weight of the evidence established Lawrence was not justified in rejecting Jobbers' offers, and he voluntarily limited his income and was ineligible for further disability benefits.

[¶ 10] Lawrence appealed to the district court and moved to supplement the certified record to include the Bureau's ex parte communications with its outside litigation counsel about the pending ALJ recommendation. The Bureau's outside litigation counsel responded that "in reviewing the [ALJ's] findings, the Bureau discussed the matter with the attorney who represented the Bureau at hearing" and those discussions were allowed under N.D.C.C. § 65–01–16(8). The court denied Lawrence's motion to supplement the record, ruling "the Bureau did, in this case, exactly what the legislature permitted it to do" under N.D.C.C. § 65–01–16(8). The court subsequently reversed the Bureau's decision, ruling the Bureau's ex parte communications with its outside litigation counsel about the pending ALJ recommendation violated Lawrence's due process rights. The court decided the appropriate remedy was to reinstate the

ALJ's recommendation to award Lawrence disability benefits.

## II

[¶ 11] On appeal, we review the Bureau's decision, not the district court's decision. *Vernon v. North Dakota Workers Comp. Bur.*, 1999 ND 153, ¶ 8, 598 N.W.2d 139. Under N.D.C.C. §§ 28–32–19 and 28–32–21, we affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, its decision is not in accordance with the law, or its decision violates the claimant's constitutional rights or deprives the claimant of a fair hearing. *Vernon*, at ¶ 8. Questions of law, including the interpretation of a statute, are fully reviewable on appeal from a decision by the Bureau. *Lee v. North Dakota Workers Comp. Bur.*, 1998 ND 218, ¶ 5, 587 N.W.2d 423.

## III

[¶ 12] The Bureau argues N.D.C.C. § 65–01–16(8) is not unconstitutional and does not violate due process.

[¶ 13] Section 65–01–16(8), N.D.C.C., was enacted in 1997 for workers compensation claims filed after July 31, 1997,[1] *see* 1997 N.D. Sess. Laws ch. 532, § 7, and provides:

> The following procedures must be followed in claims for benefits, notwithstanding any provisions to the contrary in chapter 28–32:

---

1. In 1999 N.D. Sess. Laws ch. 553, § 2, the legislature enacted language making N.D.C.C. § 65–01–16 "effective for all orders and decisions on all claims regardless of the date of injury or the date the claim was filed." N.D.C.C. § 65–01–16(12).

2. As relevant to this case, the 1997 Legislature amended those statutes to reflect that "contested cases" are now called "adjudicated proceedings." 1997 N.D. Sess. Laws ch. 277, §§ 14, 17. *See Scott*, 1998 ND 221, ¶ 9 n. 1, 587 N.W.2d 153. The proceedings in this case were conducted under the 1997 version of the statutes.

. . .

> 8. Rehearings must be conducted as hearings under chapter 28–32 to the extent the provisions of that chapter do not conflict with this section. The bureau may arrange for the designation of hearing officers to conduct rehearings and issue recommended findings, conclusions, and orders. In reviewing recommended findings, conclusions, and orders, the bureau may consult with its legal counsel representing it in the proceeding.

[¶ 14] In *Scott v. North Dakota Workers Comp. Bur.*, 1998 ND 221, 587 N.W.2d 153, we considered an issue involving the Bureau's ex parte contacts with its outside litigation counsel about a pending ALJ recommendation for a claim filed before July 31, 1997. In *Scott*, at ¶¶ 8, 10, the Bureau's outside counsel consulted with its director of claims and rehabilitation, advised the director the ALJ's recommendation should be rejected, and drafted several versions of findings, conclusions, and orders for the director to review. All of those ex parte contacts were without the knowledge or participation of the claimant or his attorney, and the claimant received no notice or copies of the Bureau's outside counsel's proposed findings, conclusions and orders prior to issuance of the final order. *Id.* at ¶ 8.

[¶ 15] We concluded the provisions of N.D.C.C. § 28–32–12.1(3) and (5) and N.D.C.C. § 28–32–17(4)(i) and (k) then in effect[2] prohibited the Bureau's outside liti-

---

In 1999 N.D. Sess. Laws ch. 290, § 1, the Legislature further amended N.D.C.C. § 28–32–12.1 to include a new subsection which provides:

> 4. In an adjudicative proceeding conducted by a hearing officer other than the agency head, counsel for the administrative agency and the agency head, without notice and opportunity for all parties to participate, may communicate and consult regarding the status of the adjudicative proceeding, discovery, settlement, litigation decisions, and other matters commonly communicated between attor-

gation counsel from making those ex parte contacts with the Bureau's director of claims and rehabilitation. *Scott*, 1998 ND 221, ¶¶ 9–10, 587 N.W.2d 153. We decided the clear intent of those statutes was to prohibit ex parte contacts between the decision maker and persons who participated in the hearing or otherwise had an interest in the case. *Id.* at ¶ 10. We concluded the Bureau's ex parte contacts with its outside counsel in that case clearly violated those statutory proscriptions. *Id.* We also concluded N.D.C.C. § 28–32–12.1(2), which allows an agency head or hearing officer to communicate with and receive aid from staff assistants if those assistants do not furnish, augment, diminish, or modify the evidence in the record, was intended to ensure staff assistance is available for the decision maker and was not intended to supersede the protections afforded by the specific provisions of N.D.C.C. § 28–32–12.1, prohibiting ex parte communications from persons who participated in an administrative hearing. *Scott*, at ¶ 11.

[¶ 16] In *Scott*, 1998 ND 221, ¶ 12, 587 N.W.2d 153, we warned the Bureau about the due process implications of these types of ex parte communications:

There are strong policy reasons for prohibiting ex parte communications between the attorney who represented the agency at an adversarial hearing and the agency decision maker. In *Camero v. United States*, 179 Ct.Cl. 520, 375 F.2d 777 (Ct.Cl.1967), the court held an agency decision was invalid where the attorney representing the agency communicated with the decision maker, advised him to reject the recommendation of a grievance committee, and participated in preparing the final decision. The court reasoned:

[O]ne of the fundamental premises inherent in the concept of an adversary hearing, particularly if it is of the evidentiary type, is that neither adversary be permitted to engage in an *ex parte* communication concerning the merits of the case with those responsible for the decision.... It is difficult to imagine a more serious incursion on fairness than to permit the representative of one of the parties to privately communicate his recommendations to the decision makers. To allow such activity would be to render the hearing virtually meaningless.

*Camero*, 375 F.2d at 780–81 (citations omitted); *see also, e.g., Sullivan v. Department of the Navy*, 720 F.2d 1266, 1271 (Fed.Cir.1983); *Koster v. United States*, 231 Ct.Cl. 301, 685 F.2d 407, 412 (Ct.Cl.1982); *Ryder v. United States*, 218 Ct.Cl. 289, 585 F.2d 482, 487 (Ct.Cl. 1978); *New York State Inspection, Security and Law Enforcement Employees v. New York State Public Employment Relations Board*, 629 F.Supp. 33, 44–45 (N.D.N.Y.1984); *Louisiana Pacific Corp. v. Koons*, 816 P.2d 1379, 1382 (Alaska 1991); 4 Jacob A. Stein et al., Administrative Law § 32.01[2][a][i] (1998).

[¶ 17] In *Scott*, 1998 ND 221, ¶ 13, 587 N.W.2d 153, we also decided N.D.C.C. § 65–01–16(8), was not applicable to that case, because the injured worker's claim was filed before July 31, 1997. In *Scott*, we were not asked to construe N.D.C.C. § 65–01–16(8); rather, we referred to the Bureau's characterization of the statute, and we rejected the Bureau's argument the legislative history should be considered to support its position the provision was intended to clarify existing law to allow the ex parte contacts in that case. *Scott*, at ¶ 14.

ney and client, to permit the agency head to make informed decisions. This subsection does not apply after recommended findings of fact, conclusions of law, and orders have been issued, except counsel for the administrative agency and the agency head may communicate regarding settlement and negotiation after recommended findings of fact, conclusions of law, and orders have been issued.

[¶ 18] Here, Lawrence's claim was filed after the effective date of N.D.C.C. § 65–01–16(8), and that provision applies to his claim. In support of his motion to supplement the record in the district court, Lawrence argued "nothing in [N.D.C.C. § 65–01–16(8) ] allows the consultations to be ex parte or exempts the bureau from N.D.C.C. ch. 28–32 certified record filing requirement." In denying Lawrence's motion, the district court cited our decision in *Scott* and effectively construed N.D.C.C. § 65–01–16(8) to authorize ex parte contacts between the Bureau and its outside counsel about a pending ALJ recommendation. Although the Bureau now argues there is no claim it deviated from the statutory mandates in N.D.C.C. § 65–01–16(8) or N.D.C.C. ch. 28–32, the district court effectively construed N.D.C.C. § 65–01–16(8) to allow ex parte contacts in this situation, and our analysis begins with the interpretation of that statute.

[¶ 19] Our primary objective in construing statutes is to ascertain the legislature's intent, and we look first at the words used in the statute, giving them their plain, ordinary, and commonly understood meaning. *Witcher v. North Dakota Workers Comp. Bur.*, 1999 ND 225, ¶ 11, 602 N.W.2d 704. If the plain language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute. *County of Stutsman v. State Hist. Soc.*, 371 N.W.2d 321, 325 (N.D.1985). *See* N.D.C.C. § 1–02–05. We construe related statutes as a whole to harmonize and give meaning to each word and phrase. *Witcher*, at ¶ 11. We construe statutes to avoid constitutional infirmities. *State ex rel. Sprynczynatyk v. Mills*, 523 N.W.2d 537, 540 (N.D.1994); *Froysland v. North Dakota Workers Comp. Bur.*, 432 N.W.2d 883, 889 (N.D. 1988). *See* N.D.C.C. § 1–02–38(1).

[¶ 20] Section 65–01–16(8), N.D.C.C., says when "reviewing recommended findings, conclusions, and orders, the bureau may consult with its legal counsel representing it in the proceeding." Nothing in that language authorizes those consultations to be ex parte, and N.D.C.C. § 28–32–12.1 generally prohibits ex parte communications between an agency and persons allowed to participate in the proceedings. The introductory language of N.D.C.C. § 65–01–16 says "[t]he following procedures must be followed in claims for benefits, notwithstanding any provisions to the contrary in chapter 28–32." The language in N.D.C.C. § 65–01–16(8) authorizing consultations when reviewing a pending ALJ recommendation is not contrary to the provisions in chapter 28–32 prohibiting ex parte communications. Under our rules of construction, we harmonize those provisions to allow the Bureau to consult with its outside legal counsel in reviewing a pending ALJ recommendation as long as those communications are not ex parte. If N.D.C.C. § 65–01–16(8) is construed to permit ex parte contacts between the Bureau and its outside litigation counsel in these circumstances, a potential due process violation exists. *See, e.g., Camero v. United States*, 179 Ct.Cl. 520, 375 F.2d 777, 780–81 (1967) and other authorities cited in *Scott*, 1998 ND 221, ¶ 12, 587 N.W.2d 153. We construe statutes to avoid constitutional infirmities. *Mills*, 523 N.W.2d at 540; *Froysland*, 432 N.W.2d at 889. We harmonize N.D.C.C. § 65–01–16(8) with N.D.C.C. ch. 28–32 to allow the Bureau to consult with its outside litigation counsel when reviewing a pending ALJ recommendation, but to preclude those consultations from being ex parte. We conclude the Bureau's ex parte contacts with its outside legal counsel about the pending ALJ recommendation violated N.D.C.C. § 65–01–16(8) and N.D.C.C. ch. 28–32.

## IV

[¶ 21] Having concluded the Bureau's ex parte contacts violated N.D.C.C. § 65–01–16(8) and N.D.C.C. ch. 28–32, we consider the appropriate remedy for this

case. In *Scott*, 1998 ND 221, ¶ 19, 587 N.W.2d 153, a majority of this Court recognized N.D.C.C. § 28–32–12.1(6), now codified at N.D.C.C. § 28–32–12.1(7), ordinarily requires disqualification of an agency head or hearing officer who receives improper ex parte communications, but that remedy was inappropriate there because the communications came to light after the final agency decision had been issued and the cat was out of the bag. We decided the Bureau's ex parte contacts in that case demonstrated a systemic disregard of the law because the record established widespread institutional noncompliance with the requirements of law, rather than a single miscue or improper act, and we concluded the proper remedy was reinstatement of the ALJ's recommended decision. *Scott*, at ¶¶ 20–22.

[¶ 22] Here, the district court decided the Bureau's ex parte contacts with outside litigation counsel established a systemic disregard of the law and ordered reinstatement of the ALJ's decision. The Bureau primarily relies on legislative history for N.D.C.C. § 65–01–16(8) to support its position that these ex parte contacts are authorized by statute. Although we have harmonized N.D.C.C. § 65–01–16(8) and N.D.C.C. ch. 28–32 in a manner contrary to the Bureau's position, under these circumstances, we are not persuaded the Bureau's actions establish a systemic disregard of the law warranting reinstatement of the ALJ's recommended decision.

[¶ 23] Lawrence nevertheless argues he is entitled to reinstatement of disability benefits. We conclude, however, a remand for a rehearing is necessary for application of the correct legal standard for justification under N.D.C.C. § 65–05–08(7).

[¶ 24] Section 65–05–08(7), N.D.C.C., provides, in relevant part [3]:

No benefits may be paid for disability, the duration of which is less than five consecutive calendar days. If the period of disability is five consecutive calendar days' duration or longer, benefits must be paid for the period of disability provided that:

. . . .

7. If the employee voluntarily limits income or refuses to accept employment suitable to the employee's capacity, offered to or procured for the employee, the employee is not entitled to any disability or vocational rehabilitation benefits during the limitation of income or refusal to accept employment unless the bureau determines the limitation or refusal is justified.

[¶ 25] We have not previously considered when an injured worker is justified in refusing employment under N.D.C.C. § 65–05–08(7). In *Fuhrman v. North Dakota Workers Comp. Bur.*, 1997 ND 191, 569 N.W.2d 269, we considered whether an injured worker had "good cause" under N.D.C.C. § 65–05.1–04(6), for failing to comply with a rehabilitation plan requiring attendance at a training course in Minneapolis. We applied a definition of good cause similar to that used in employment cases, *see Esselman v. Job Service*, 548 N.W.2d 400, 402 (N.D.1996), *Lambott v. Job Service*, 498 N.W.2d 157, 159 (N.D. 1993), and concluded an injured worker has good cause for failing to attend a rehabilitation program if the worker has a reason that would cause a reasonably prudent person to refuse to attend the program under the same or similar circumstances. *Fuhrman*, at ¶¶ 8–9. *See also Hoffman v. North Dakota Workers Comp. Bur.*, 1999 ND 66, ¶ 15, 592 N.W.2d 533 (applying objective, reasonable person standard to decide whether injured worker had good cause to refuse to attend rehabilitation program). In *Fuhrman*, at ¶ 12, we held the Bureau's finding the injured worker, a Bismarck resident, did not have good cause for failing to relocate to Minne-

---

**3.** Section 65–05–08(7), N.D.C.C., was enacted in its present form in 1997 N.D. Sess. Laws ch. 542, § 1. Similar language was initially enacted in 1989 N.D. Sess. Laws ch. 770, § 3, and was formerly codified at N.D.C.C. § 65–05–10(2).

apolis to attend a training program was not supported by a preponderance of the evidence. In *Hoffman,* at ¶¶ 15–21, a majority of this Court held, as a matter of law, the injured worker, a Jamestown resident, had good cause not to attend a rehabilitation training program in Minot when the Bureau wrongfully denied him a second domicile allowance.

[¶ 26] In *Pulver v. Dundee Cement Co.,* 445 Mich. 68, 515 N.W.2d 728, 730 (1994), the Michigan Supreme Court considered an issue about an injured worker's residence vis-a-vis the situs of a job offer under statutory language precluding the worker from receiving further wage loss benefits if the worker refuses a bona fide offer of reasonable employment "without good and reasonable cause." The court recognized there was no exclusive and exhaustive definition for "good and reasonable cause," but outlined the following framework for gauging an injured worker's refusal to accept an employment offer:

> Those factors may include: (1) the timing of the offer, (2) if the employee has moved, the reasons for moving, (3) the diligence of the employee in trying to return to work, (4) whether the employee has actually returned to work with some other employer and, (5) whether the effort, risk, sacrifice or expense is such that a reasonable person would not accept the offer.

*Pulver,* at 735 [footnote omitted]. *See also Thompson v. Claw Island Foods,* 1998 ME 101, ¶ 18, 713 A.2d 316 (applying same framework under Maine's statutory provisions). The Pennsylvania Supreme Court also has recognized an injured worker's residence vis-a-vis the situs of a job offer is one factor in evaluating this type of issue. *See Kachinski v. Workmen's Comp. Appeal Bd.,* 516 Pa. 240, 532 A.2d 374, 379 (1987) (stating injured employee's place of residence is a relevant consideration in determining whether an offer is actually available to the employee).

[¶ 27] We apply the definition of "good cause" in *Fuhrman* and *Hoffman*

for evaluating an injured worker's justification for refusing a job offer under N.D.C.C. § 65–05–08(7). We conclude an injured worker is justified in refusing a job offer if a reasonably prudent person would refuse the offer under the same or similar circumstances. In considering this issue, we also believe the nonexclusive factors in *Pulver* are relevant for assessing whether a worker's refusal of a job offer is justified under N.D.C.C. § 65–05–08(7).

[¶ 28] In rejecting the ALJ's recommendation, the Bureau found Jobbers "by providing [Lawrence] with full-time wages, for part-time work, the free use of a company vehicle, paid airfare from California to Bismarck, went well beyond what any reasonable employer should be required to provide an employee with respect to a modified transitional job offer" under North Dakota law. The Bureau's decision erroneously focused only on the reasonableness of the job offer, rather 'than whether a reasonably prudent person would have refused the offer under the same or similar circumstances.

[¶ 29] When Jobbers hired Lawrence as an over-the-road trucker in August 1997, he had been living in California since 1995. The nature of Lawrence's job required him to travel throughout the country. Wally Keller, the general manager at Jobbers, testified it was "jointly . . . agreed" that Lawrence would return to California for treatment of his injury. Lawrence testified he had a sister and brother-in-law living in the area in California. There are obvious logistical and expense issues associated with moving from California to Bismarck to accept a transitional job. The reason for Lawrence's physical presence in California with Jobbers' joint agreement, coupled with the obvious logistics of a move and his physical condition support an inference that Lawrence's refusal of the transitional job offer in Bismarck was justified. *See Fuhrman,* 1997 ND 191, ¶ 10, 569 N.W.2d 269 (stating numerous circumstances involving economic or financial hardship would cause a reasonably pru-

dent person not to attend a rehabilitation program far away from home); *Hoffman*, 1999 ND 66, ¶ 20, 592 N.W.2d 533 (same).

[¶ 30] Because the parties did not fully marshal evidence or argument under the relevant factors for deciding whether Lawrence's refusal was justified, we conclude the appropriate remedy in this case is a remand for rehearing. On rehearing, factors for consideration include Lawrence's presence in California, his physical condition, and whether the effort, risk, sacrifice, and expense of accepting the offer for a transitional job in Bismarck were such that a reasonably prudent person would refuse the offer under the same or similar circumstances. On remand, Bureau officials who have received ex parte communications with the Bureau's outside litigation counsel are disqualified from this matter under N.D.C.C. § 28–32–12.1(7).

[¶ 31] We reverse the district court judgment and remand with instructions to remand to the Bureau for proceedings consistent with this opinion.

[¶ 32] GERALD W. VANDE WALLE, C.J., MAURICE R. HUNKE, D.J., concur.

WILLIAM A. NEUMANN, J.

I concur in the result.

[¶ 33] MAURICE R. HUNKE, D. J., sitting in place of KAPSNER, J., disqualified.

SANDSTROM, Justice, dissenting.

[¶ 34] I agree with the majority that the statutes can be harmonized, and I would harmonize them. I do not agree with majority's assertion that the Bureau improperly analyzed the worker's justification for refusal of the job offer. I, therefore, dissent.

I

[¶ 35] Although I would harmonize N.D.C.C. §§ 28–32–12.1 and 65–01–16, the Bureau's interpretation of N.D.C.C. § 65–

01–16(8) is not unreasonable. Indeed, the Bureau's interpretation is consistent with the clear legislative history, *see Hearing on H.B. 1270 Before the House Industry, Business, and Labor Comm.*, 55th N.D. Legis. Sess. (Feb. 3, 1997), and consistent with this Court's own interpretation of the statute in *Scott v. North Dakota Workers Comp. Bureau*, 1998 ND 221, ¶¶ 13–17, 587 N.W.2d 153 (emphasis added):

[¶ 13] *The Bureau nevertheless asserts the ex parte communications in this case were not improper, citing N.D.C.C. § 65–01–16(8):*

> Rehearings must be conducted as hearings under chapter 28–32 to the extent the provisions of that chapter do not conflict with this section. The bureau may arrange for the designation of hearing officers to conduct rehearings and issue recommended findings, conclusions, and orders. In reviewing recommended findings, conclusions, and orders, the bureau may consult with its legal counsel representing it in the proceeding.

This provision was enacted by the 1997 Legislative Assembly, and applies only to claims filed after July 31, 1997. *See* 1997 N.D. Sess. Laws Ch. 532, §§ 1, 7. It clearly does not apply in this case.

[¶ 14] The Bureau asserts we may nevertheless look to the legislative history of N.D.C.C. § 65–01–16(8) to determine it was intended to clarify existing law, and demonstrates the legislature's intent to allow the ex parte contacts which occurred in this case. We disagree.

[¶ 15] It is presumed the legislature acts with a purpose and does not perform useless acts. *State v. Beilke*, 489 N.W.2d 589, 592 (N.D.1992); *State Bank of Towner v. Edwards*, 484 N.W.2d 281, 282 (N.D.1992). Thus, it is presumed a legislative enactment is intended to change existing law. *Heck v. Reed*, 529 N.W.2d 155, 161 (N.D.1995); *Beilke*, 489 N.W.2d at 592; *State Bank*, 484 N.W.2d at 282. However, when the clear pur-

pose of an amendment to a statute is to merely clarify existing law, the policy expressed in the amendment may be considered when construing rights under the original statute. *Effertz v. North Dakota Workers Compensation Bureau*, 525 N.W.2d 691, 693 (N.D. 1994).

[¶ 16] The principle allowing consideration of a subsequent clarifying amendment does not apply under the facts in this case. The 1997 Legislature did not amend an *existing* statute with the express intent of clarifying that statute. Here, the legislature enacted a *new* statute in a different title of the Century Code. The existing statute remains in its original form. *Under these circumstances, the 1997 enactment is not a "clarifying amendment," but is a new enactment which attempts to carve out an exception to the general rule of N.D.C.C. § 28–32–12.1(3).*

[¶ 17] *Prior to the 1997 amendment, the Bureau was clearly governed by the general rule of N.D.C.C. § 28–32–12.1(3), which prohibited the ex parte contacts in this case. The 1997 Legislature created a new provision in the Workers Compensation title of the Code, intended to allow the Bureau to consult with its attorneys when reviewing an ALJ's recommended decision.* However, all other agencies remain subject to the proscriptions in N.D.C.C. § 28–32–12.1, which remains in effect. Under these circumstances, the 1997 enactment is not a clarifying amendment, but represents a clear intended change in the law. Accordingly, we do not consider the 1997 enactment or its legislative history when construing the Bureau's obligations under N.D.C.C. § 28–32–12.1 prior to the effective date of N.D.C.C. § 65–01–16(8). (Footnote omitted).

## II

[¶ 36] The majority says at ¶ 28: "The Bureau's decision erroneously focused only on the reasonableness of the job offer, rather than whether a reasonably prudent person would have refused the offer under the same or similar circumstances." The majority, however, focuses on only one sentence out of context. The Bureau's Findings of Fact, Conclusions of Law and Final Order specifically states: "The Bureau adopts that portion of the Administrative Law Judge's rationale which sets forth that the question to be answered in this case is whether the Claimant was justified in refusing the various job offers made to him by the employer, and whether he voluntarily limited his income by declining said job offers." The Bureau's decision taken as a whole belies the majority's characterization and reflects the appropriate focus on the worker:

The evidence of record having been considered and appraised by the Administrative Law Judge, and the Administrative Law Judge having issued his Recommended Findings of Fact and Conclusions of Law on October 22, 1998, and the Bureau having carefully reviewed the transcript of the administrative hearing which took place on August 21, 1998, and the exhibits made a part of the record at that hearing,

## SUMMARY OF EVIDENCE

The Bureau adopts the Administrative Law Judge's summary of the evidence with the following clarifications and/or additions:

1. The January 30, 1998 medical note made by Dr. Naugle's office (Exhibit C—49) reiterated Dr. Naugle's "opinion" regarding the Claimant's release to work abilities; the Administrative Law Judge's summary at page 8 stating that Dr. Naugle was simply "made aware" of the modified job offer is herein clarified and corrected;

2. On or about July 28, 1997, the Claimant was hired by Jobbers; within two days thereafter, the Claimant had flown to Bismarck, North Dakota, to start work on July 30, 1997;

3. Between August 1, 1997 and September 13, 1997, the date of injury, the Claimant only returned to California on one occasion, to pick his then girlfriend up;

4. At no time prior to the Bureau issuing its February 10, 1998 Notice of Intention to Discontinue Benefits did the Claimant ever allege to either the Bureau, or the employer, that he could not financially afford to return to Bismarck to accept the transitional modified job offer; in three separate written job declinations that he provided to Jobbers, not once did the Claimant allege he was financially unable to return to Bismarck;

5. By the time the Claimant turned the third modified job offer down on or about February 4, 1998 (Exhibit C—54), Claimant was aware that Jobbers would provide him with a company vehicle for his use, that he would only need to work 20 hours a week (four hours per day), and that he would be paid a full-time wage ($507 per week). In addition, while Claimant never requested an advance from Jobbers, he was well aware and had in the past received advances from Jobbers and was also aware that Jobbers was willing to fly the Claimant to Bismarck, at their own expense;

6. Despite being released to work in January of 1998, the Claimant has never at any time since his release date ever sought any employment, in any city, anywhere in the United States;

7. The facility referenced by the Administrative Law Judge at page 11 of his "Summary of Evidence" which Kathy Dewald testified to included a full kitchenette for the use by the Claimant;

8. The Claimant presented absolutely no evidence to the Bureau of any fixed expenses, such as, for example, a home mortgage or monthly rent pursuant to a contractual lease, which he would have continued to incur in California had he returned to Bismarck to accept the modified job offer;

9. The Claimant presented absolutely no evidence or proof to the Bureau to substantiate his allegations that he cannot financially afford to return to Bismarck to accept the transitional job offer.

## RATIONALE

The Bureau adopts that portion of the Administrative Law Judge's rationale which sets forth that the question to be answered in this case is whether the Claimant was justified in refusing the various job offers made to him by the employer, and whether he voluntarily limited his income by declining said job offers.

The Bureau further adopts that portion of the ALJ's rationale that the Claimant's argument regarding "personal vehicle" is without merit, that portion which states the Claimant would have greater access to medical providers including physical therapy in Bismarck as opposed to the remote area in which he lives, and that portion which states that the Claimant should be expected to attempt the modified job offer of Jobbers.

The Bureau specifically rejects that portion of the ALJ's "Rationale" that states that "Claimant's refusal to accept the job without some provision for payment of his living expenses is justified."

## FINDINGS OF FACT

Recommended Findings of Fact 2, 3, 5, 6 and 7 are hereby adopted as part of the Bureau's Findings of Fact;

The first sentence of Recommended Finding of Fact I is likewise hereby adopted as part of the Bureau's Findings of Fact;

Recommended Finding of Fact 4 is modified to reflect that Dr. Naugle released the Claimant to work four hours a day for four weeks, increasing to six hours per day for two weeks, and then eight hours per day thereafter;

Recommended Finding of Fact 8 is not adopted by the Bureau; to the contrary, the greater weight of the evidence shows that the Claimant was not justified in rejecting the employer's job offer, and because of his lack of justification, he voluntarily limited his income and remains uneligible [sic] for disability benefits during the period of his continuation or refusal to accept employment.

The employer, by providing the Claimant with full-time wages, for part-time work, the free use of a company vehicle, paid airfare from California to Bismarck, went well beyond what any reasonable employer should be required to provide an employee with respect to a modified transitional job offer pursuant to North Dakota law.

## CONCLUSIONS OF LAW

1. Recommended Conclusion of Law 1 is hereby adopted as part of the Bureau's Conclusions of Law; Recommended Conclusions of Law 2 and 3 are specifically not adopted by the Bureau.

2. Section 65–05–08(7) of the North Dakota Century Code provides that:

"If the employee voluntarily limits income or refuses to accept employment suitable to the employee's capacity, offered to or procured for the employee, the employee is not entitled to any disability or vocational rehabilitation benefits during the limitation of income or refusal to accept employment unless the bureau determines the limitation or refusal is justified."

3. Pursuant to North Dakota law, it is for the Bureau to determine whether the refusal to accept employment suitable to the employee's capacity is justified. Under the facts and circumstances of this case, the Bureau does not find that the Claimant was justified in refusing the job offer made by Jobbers.

4. The modified job offer was within the Claimant's physical restrictions as well as his ability to learn. The job was to initially entail sedentary work at four hours per day (20 hours per week) at a full-time wage, $507 per week. The employer offered the Claimant the personal use of a company vehicle, and offered to pay the Claimant's airfare to return to Bismarck.

5. There exists no requirement, under North Dakota law, requiring an employer to pay a Claimant's "meal and living expenses" in order to validate a good faith modified transitional job offer.

## ORDER

1. The Bureau's Amended Order dated May 7, 1998, which clarifies by reference and includes the Bureau's Order of March 10, 1998, is affirmed in all respects.

The Bureau's order as a whole reflects a proper focus on the worker.

[¶ 37] Whether an action is justified is ordinarily a question of fact:

Ordinarily, justification is an issue of fact. *Kjesbo* [*v. Ricks* ], 517 N.W.2d [585,] 588 [ (Minn.1994) ] (citing *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 134 N.W.2d 892, 900 (1965)). The test for proving justification is what is reasonable conduct under all the circumstances of the case. *Id.*

*Fankhanel v. M & H Constr. Co.,* 1997 ND 20, ¶ 10, 559 N.W.2d 229. *See also CAP Partners v. Cameron,* 1999 ND 178, ¶¶ 10–11, 599 N.W.2d 309; *Greenwood v. Greenwood,* 1999 ND 126, ¶ 17, 596 N.W.2d 317; *Larsen v. Commission on Med. Competency,* 1998 ND 193, ¶ 32, 585 N.W.2d 801. The Bureau made the appropriate analysis.

## III

[¶ 38] I would reverse the district court and reinstate the Bureau's order.

[¶ 39] Dale V. Sandstrom